**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Robert HALL, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 8, 2004.
Filed Jan. 27, 2005.

Robert Hall, Frackville, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth.

BEFORE: LALLY–GREEN, OLSZEWSKI, and TAMILIA, JJ.

OPINION BY OLSZEWSKI, J.:

¶ 1 The trial judge denied Robert Hall's Post–Conviction Relief Act petition and appellant has appealed. We must therefore revisit the gruesome beating and murder of Edward Williams which, a jury found, was done by appellant's hands.

### Facts

¶ 2 On March 29, 1997, in between the hours of 2 a.m. and 4 a.m., Edward Williams left his house, holding a "wad of money" worth $1,400. A short time later, Williams was beaten and then, with a shotgun blast to the back of his head, murdered in a home owned by Robert Hall.

¶ 3 The day after this terrible event occurred was Easter Sunday and, as appellant's neighbor testified, "I was in my kitchen cooking at four o'clock in the afternoon when my five year old [son] Frank told me there was a man sleeping with a blanket in the alleyway. I didn't believe him. I only glanced out and didn't see anything. The next day he told me the man with the blanket was dead. Again I didn't believe him. He told me every day about the man and I didn't believe him." N.T. Trial, 4/2/98, at 107–08. It was not until Thursday, April 3, 1997, that the police were informed of the situation and investigated; there, lying in the same place young Frank saw for days, was the body of Edward Williams, stripped to his underpants, wrapped in a blanket and tied with rope.

¶ 4 A police canvass of the neighborhood led them to Jose Miller, another neighbor of appellant's, and a man who had known appellant for about 15 years. In a signed, written statement, Miller told the police that he entered appellant's house on Saturday, March 29, 1997, went upstairs and "saw the body. They [Robert Hall and codefendant, Keith Brown] had taken his clothes off except for his underpants which were still on him, and there was blood on the floor and on the walls, and Rob and Keith were cleaning up the blood." Miller further told the police that appellant, Robert Hall, confessed to shooting Edward Williams and that Miller watched as appellant and Brown tied the body up in blanket and "threw it out in the back alley." N.T. Trial, 4/2/98, at 118.

¶ 5 After Miller gave his statement, the police drove him home. It just so happened that the next day was garbage day and, looking across the street, the police could see garbage bags piled in front of appellant's house. An inventory of this garbage revealed: two differently sized pairs of bloodied shoes, three shotgun shells (two of which were fired, one still live), a letter and bank statement for Edward Williams and various other blood-stained objects. On the ground underneath all of the trash was a metal knife blade and a blood-stained customer receipt for a person with the last name of "Williams," from a "Doctor Rogers." A search warrant for appellant's home was then obtained.

¶ 6 The search warrant was executed around 12:30 on the afternoon of April 9, 1997. Suffice it to say, the police entered to a rather macabre scene: on the second

floor of the home, in the "middle bedroom," appellant was spackling over "what appeared to be red stains ... The spackle was being placed on the wall, the red stains were coming through." N.T. Trial, 4/2/98, at 216. Blood was found splattered throughout the entire bedroom, a bloody palm print was found on the doorframe and there was a shotgun blast through the floorboards. Among the other things the police found within the house were: a duffel bag that contained eleven pieces of bloody clothing; Williams' blood-stained coat; Williams' wallet with photo-identification; and "a floral pillow case, it was a patterned pillow case of pink, green, like a sea green almost, and white. And that was identical to the quilt or sheet that the decedent was wrapped in the day that he was found in the alley." N.T. Trial, 4/2/98, at 219.

¶ 7 Appellant was arrested and, along with Keith Brown, was tried before a jury of his peers. The Commonwealth theorized that Williams was killed for his money, and attempted to prove this by first introducing the testimony of Jose Miller. At trial, however, Miller testified inconsistently with both the prior statement he gave to the police and his prior testimony at a preliminary hearing. According to Miller's in-court testimony, he walked into appellant's house on Saturday, March 29, 1997, saw blood and a body lying on the first floor, but then just ignored the sight and talked to appellant about something else. This strange testimony allowed the Commonwealth to read to the jury the prior statements Miller made regarding appellant's: blood-soaked second floor; murder admission; attempts to clean the blood and disposal of the corpse.

¶ 8 Kaciena Anderson, a friend of appellant's, also testified for the prosecution. She told the jury that she visited appellant's home over Easter weekend and was apparently able to enter every room in the house except for the "middle bedroom:" this bedroom was guarded by both appellant (who was wearing a bloody shirt) and a man named Elwood Quillen.

¶ 9 A few days later appellant asked Ms. Anderson to return to the house and "clean [the place] up before the work people came. Rob told me to go in and make everything cool." N.T. Trial, 4/6/98, at 101. While Ms. Anderson cleaned, a friend of hers found a sawed-off pump action shotgun under a mattress. Further, appellant told Ms. Anderson that Keith Brown: "got me in this shit ... I had to wrap the motherfucker up." N.T. Trial, 4/6/98, at 98. When Ms. Anderson asked him what had happened, appellant did not answer. Jose Miller, however, had told Ms. Anderson that

> [Keith Brown] shot the guy. It was over some money, and the argument started in the front bedroom. [Keith Brown] started everything, and [appellant] had to go along with it. Before they shot him, they made him take off his clothes. They were going to cut off his legs and put them in a plastic bag. Instead, they placed him in a sheet and tied him up with a rope. They dragged him into the alley. His clothes were at the other end of the alley. They put him in the other end of the alley first, and then they moved him.

N.T. Trial, 4/6/98, at 96.

¶ 10 Also damning to appellant was the testimony of Mary Elizabeth Graham, Keith Brown's girlfriend at the time of the murder. She told the jury that sometime around 8 a.m. and 10 a.m. on Easter Sunday, appellant walked up to her car and just handed Brown $100. N.T. Trial, 4/3/98, at 174. Further, Ms. Graham was told by Brown that, on the day before Easter, Brown arrived at appellant's home only to see appellant, holding a rifle, and

pacing around a bleeding body. N.T. Trial, 4/3/98, at 181.

¶ 11 With respect to forensics, there were too many bloodied objects to DNA-test everything. The selected nine objects, however, showed interesting results. Two blood-stained tee-shirts from the duffel bag were tested: one had DNA matching appellant, the other had the victim's DNA. There was also a blood-stained mini-blind from appellant's home which had a mixture of both appellant's and the victim's DNA covering it; a blood-stained leather jacket, hung on appellant's door-hook, that matched the victim's DNA and a blood-stained pillowcase, paper bag, and shoe all which tested a match for the victim's DNA. N.T. Trial, 4/6/98, at 157–160.

¶ 12 Appellant declared he was innocent of all crimes. According to appellant, at the time of the murder Elwood Quillen was living in his house. Appellant testified that on Easter Sunday, he went to his house "to see if Elwood wanted to come to church with me." N.T. Trial, 4/7/98, at 37. When appellant arrived, he saw a body lying on the living room floor and Quillen with a shotgun in his hand. He then got scared and called his lawyer to tell the lawyer that there was a body in his house. As appellant testified, he went back to the house the following Wednesday and saw neither the body nor any blood on the walls. N.T. Trial, 4/7/98, at 41.

¶ 13 The Commonwealth rebutted appellant's testimony with Mary Elizabeth Graham. Ms. Graham recounted the conversation she had with her boyfriend, Keith Brown, but added that Brown also told her how he got involved in the murder. She testified:

[Brown] told me that Rob came up to him and told him he has two friends in Ardmore, and he's going to call them down there. He's going to call them down there, and they was going to take

their money because they have a lot of money and drugs on them.

N.T. Trial, 4/7/98, at 123.

¶ 14 Further, she told of both appellant's and Brown's attempts to get Elwood Quillen to take their fall. She testified that in May, Brown told her that he:

[s]hould be out in August, they don't have anything on him. It's a young boy that's there with him and Rob, where he was, and he's there on other charges, but he's going to say that he did it. He's going to say that he did it because they're trying to pin it on Keith and Rob. They already have Rob, so Rob is not going to turn his back on him. They already have him because they have him with the rifle. But this guy is going to say that he did it so Keith, they wouldn't, you know, have anything on him. And when it came time for me to testify, that when they asked me did— was that the weapon, all I have to do is say that I don't remember, I don't recall what it looked like, and I was under stress.

N.T. Trial, 4/7/98, at 125.

¶ 15 The jury found appellant guilty of second-degree murder, robbery, criminal conspiracy and abuse of a corpse; on December 13, 1999, we affirmed his judgment of sentence and, on June 13, 2000, the Pennsylvania Supreme Court denied *allocatur*. Appellant's first attempt at post-conviction collateral relief has proceeded as follows:

On June 4, 2001, [appellant] filed a *pro se* petition for relief pursuant to the Post Conviction Relief Act ... Daniel Rendine, Esquire, was appointed and filed an amended petition on February 19, 2002. On May 21, 2002, [the PCRA] court sent [appellant] a Notice Pursuant to Pennsylvania Rule of Criminal Procedure 907 regarding his PCRA. [Appel-

lant] filed a *pro se* response wherein he alleged that PCRA counsel was ineffective for failing to raise each of the twenty-eight claims [appellant] wished to raise. This petition was denied on June 10, 2002.

[Appellant] then filed a "Petition to Proceed Pro Se and Waiver of Counsel" with [the PCRA court]. Mr. Rendine filed a "Petition for Remand" with [the PCRA court], asking that the case be remanded to the PCRA court to determine whether [appellant's] waiver of counsel was knowing, intelligent and voluntary. On August 10, 2002, the Pennsylvania Superior Court remanded the case to the PCRA court.

On September 11, 2002, a colloquy was held where [appellant] expressed his desire to proceed *pro se* in order to preserve his appeal. [The PCRA court] granted [appellant's] request to proceed *pro se*, dismissed Mr. Rendine, and returned the case to the Superior Court. [Appellant] appealed and the Superior Court reversed and remanded to [the PCRA court] on July 9, 2003.

On December 1, 2003, the Commonwealth responded to [appellant's] *pro se* PCRA petition. On December 11, 2003, [the PCRA court] sent [appellant] a Notice Pursuant to Pennsylvania Rules of Criminal Procedure 907, and his petition was denied on January 28, 2004. On February 18, 2004, this appeal was filed.

Trial Court Opinion, 2/20/04, at 1–2.

¶ 16 Appellant has numbered 25 issues in his brief to our Court. Some of these issues have been previously litigated, some are waived; all, however, are meritless. We will explain.

### Standard of Review

■ ¶ 17 When reviewing a PCRA court's denial of a petition for relief, "[o]ur standard of review ... is limited to wheth-er the trial court's determination is supported by evidence of record and whether it is free of legal error." *Commonwealth v. Allen*, 557 Pa. 135, 732 A.2d 582, 586 (1999).

### Analysis

¶ 18 Appellant brings many "ineffectiveness of counsel" claims. As our courts have continuously held, claims asserting ineffectiveness of counsel must satisfy three requirements. Appellant must "plead and prove:" "(1) that his claim has arguable merit; (2) that counsel's actions or inaction was not the product of a reasonable strategic decision; and, (3) that he suffered prejudice because of counsel's action or inaction." *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 304 (1999). Whether appellant can be said to suffer "prejudice" in this context is by alleging and proving "there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different." *Commonwealth v. Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001).

■ ¶ 19 Further, since appellant's judgment of sentence became final before the Supreme Court handed down its *Commonwealth v. Grant* opinion, he is required to "layer" his ineffectiveness claims. 572 Pa. 48, 813 A.2d 726 (2002). This requirement stems from the fact that, prior to *Grant*, claims of trial counsel ineffectiveness were cognizable on direct appeal. *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977). As PCRA waiver occurs "if the petitioner could have raised [the issue] but failed to do so before trial, at trial, ... on appeal or in a prior state post conviction proceeding," appellant has already waived any claims of trial counsel ineffectiveness: these claims "could have [been] raised" on his prior direct appeal. 42 Pa.C.S. § 9544(b). He may, however, assert that his *appellate* counsel was inef-

fective for failing to raise instances of trial counsel's ineffectiveness.[1]

¶ 20 Whether this ineffectiveness assertion has "arguable merit," (and thus, whether the first prong of appellate counsel's ineffectiveness is met), however, depends on whether appellant's *trial counsel* is deemed ineffective. Appellant must therefore plead and prove the three prongs as to his trial counsel's ineffectiveness; if that is not done, then, necessarily, there is no "arguable merit" in appellant's argument as to appellate counsel's ineffectiveness. *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003).

¶ 21 We will therefore first ask whether appellant's allegations of appellate counsel ineffectiveness have arguable merit. To determine this we will see whether trial counsel's actions meet the three-prong ineffectiveness test.

### Issues 1 & 2.

■ ¶ 22 Appellant first claims that his trial counsel was ineffective for failing to present evidence that Commonwealth witness Jose Miller is mentally ill. According to appellant, counsel could have shown this in two ways: first, by introducing Miller's "mental records" and second, by calling Miller's legal guardian, Mini Miller, as a defense witness. As the trial court correctly pointed out, the problem with this claim is that appellant has not shown what the medical records would reveal, nor has he provided anything on "Mini Miller."

■ ¶ 23 First, in order to prevail on an ineffectiveness claim for "failure to call a witness," appellant must demonstrate that:

(1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant.

*Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 856 (2003).

■ ¶ 24 There is no affidavit from Mini Miller and we have no idea whether she would have testified for the defense, what she would have testified to, or whether the absence of her testimony has prejudiced appellant. With respect to the medical records, the same is true: they are not attached, we do not know what they would have established and we do not know whether they would have impeached Miller. Appellant has thus failed to "plead ... [that his] conviction or sentence resulted from ... [i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543. Dismissal, rather than a remand for an evidentiary hearing, is proper under such circumstances. *Commonwealth v. Farmer*, 758 A.2d 173, 179 (Pa.Super.2000).

---

1. The Commonwealth declares that appellant has not properly layered his ineffectiveness claims and asks that we find all of his claims waived. We will not do this. While we will not act as an attorney for the *pro se* appellant, we do give that person some degree of leniency. In this case, appellant has substantially complied with the layering requirements: he has argued the ineffectiveness of his appellate counsel for failing to raise the ineffectiveness of his trial counsel. Further, our Supreme Court has made it clear that when it comes to improper "layering" the right course of action for any PCRA court is not to waive the claims, but to remand and allow the petitioner to replead. *Commonwealth v. Wilson*, 861 A.2d 919, 929 n. 9 (Pa.2004). Yet, "the remand procedure is unnecessary where, as here, the underlying claim of ineffective assistance of counsel is defective or meritless." *Id.*

¶ 25 Further, as Pennsylvania Rule of Criminal Procedure 902 states, if the facts underlying a PCRA claim do not "appear in the record," the petitioner must identify "any affidavits, documents, and other evidence showing such facts." Pa.R.Crim.P. 902(A)(12)(b). Such outside evidence *must* be attached to the PCRA petition or, if they are not, the petitioner must say why the evidence is not attached. Pa. R.Crim.P. 902(D). Here, petitioner simply has not done this and, therefore, his claim of ineffectiveness has no "arguable merit." This dooms his ineffectiveness claim and, since appellant has failed to make out a *prima facie* ineffectiveness claim, the PCRA court properly dismissed the claim. *Farmer*, 758 A.2d at 179; *Commonwealth v. Lopez*, 559 Pa. 131, 739 A.2d 485, 495 (1999); *Commonwealth v. Collins*, 546 Pa. 616, 687 A.2d 1112, 1115 (1996)(*plurality* ); *Commonwealth v. Carter*, 443 Pa.Super. 231, 661 A.2d 390, 396 (1995).

*Issue 3.*

■ ¶ 26 Next, appellant claims that his trial counsel rendered ineffective assistance when counsel failed to "request that the court instruct the jury to receive Miller's testimony with caution, as that testimony comes from [a] corrupt polluted and tainted source." According to appellant, there was "overwhelming evidence as to Miller's participation in this murder." Appellant's Brief, at 11.

■ ¶ 27 An "accomplice" is an individual who "knowingly and voluntarily cooperates with or aids another in the commission of a crime." *Commonwealth v. Carey*, 293 Pa.Super. 359, 439 A.2d 151, 158 (1981). Thus, and in following with the prior statement, a "showing of mere presence at the scene of a crime is insufficient to support a conviction: evidence indicating participation in the crime is required." *Commonwealth v. Keblitis*, 500 Pa. 321, 456 A.2d 149, 151 (1983).

¶ 28 As to when a "corrupt source" instruction is necessary, we have previously stated:

It is the rule in Pennsylvania that the testimony of an accomplice of a defendant, given at the latter's trial, comes from a corrupt source and is to be carefully scrutinized and accepted with caution; it is clear error for the trial judge to refuse to give a charge to this effect after being specifically requested to do so. The justification for the instruction is that an accomplice witness will inculpate others out of a reasonable expectation of leniency. An accomplice charge is necessitated not only when the evidence requires an inference that the witness was an accomplice, but also when it permits that inference. Thus if the evidence is sufficient to present a jury question with respect to whether the prosecution's witness was an accomplice, the defendant is entitled to an instruction as to the weight to be given to that witness's testimony. Where, however, there is no evidence that would permit the jury to infer that a Commonwealth witness was an accomplice, the court may conclude as a matter of law that he was not an accomplice and may refuse to give the charge. This is so because a trial court is not obliged to instruct a jury upon legal principles which have no applicability to the presented facts. There must be some relationship between the law upon which an instruction is required and the evidence presented at trial.

*Commonwealth v. Manchas*, 430 Pa.Super. 63, 633 A.2d 618, 627 (1993) (*citations omitted* )(*internal quotations omitted* )(*internal corrections omitted* )

¶ 29 It is true that, at trial, appellant's counsel *wished* to paint the picture that Miller was the initial murder suspect. It is also true, however, that every single

police officer testified that Miller was never arrested, never charged, and was never even a suspect in the actual killing. Rather, Miller was "brought [into the police station] as a witness." N.T. Trial, 4/3/98, at 11. In fact, there was absolutely no evidence Miller participated in any of appellant's misdeeds. Appellant's argument to the contrary is a misreading of the record and frivolous; since there was "no evidence that would permit the jury to infer that [Miller] was an accomplice" to the murder and robbery of Williams, no "corrupt source" instruction was warranted and counsel cannot be faulted for failing to request the instruction. *Manchas*, 633 A.2d at 627.

*Issue 4.*

¶ 30 Appellant next argues that his trial counsel should have called Elwood Quillen's family members, all of whom would have "testified to the indisputable fact . . . that Mr. Quillen told them all that he had killed the [deceased] on March 30th 1997, and that . . . Appellant was 100% innocent of this murder." Appellant's Brief, at 14.

¶ 31 Again, however, appellant has failed to attach an affidavit from any of these individuals. Since "we will not grant relief based on an allegation that a certain witness may have testified in the absence of an affidavit to show that the witness would, in fact, testify," appellant's claim is without arguable merit and was properly dismissed. *Commonwealth v. Days*, 718 A.2d 797, 803 (Pa.Super.1998).

*Issue 5.*

¶ 32 Appellant's trial counsel was also ineffective, it is alleged, for failing to present the testimony of Richard Strohm, the defense's private investigator. According to appellant, Strohm would have testified that Quillen admitted to killing Edward Williams. While appellant supports this assertion with absolutely no le-

gal argument, we assume that he views such hearsay as admissible since the statement was against Quillen's penal interest.

¶ 33 Pennsylvania Rule of Evidence 804(b)(3) defines a "statement against interest." It declares:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. *In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

Pa.R.E. 804(b)(3)(emphasis added).

¶ 34 Here, the corroborating circumstances "clearly indicate the *[un]trustworthiness* of the statement." At the time Quillen "admitted" to killing Williams, Quillen was getting ready for his own murder trial; he had recently shared a cell with appellant; he later reneged on his admission, telling the police that he confessed because appellant "told me that I should come down here and confess to killing Ed. He said that if I did that— he'd get set free—he'd get me out too"; a lie detector had shown Quillen to be untruthful about killing Williams and the testimony of Mary Elizabeth Graham showed that appellant was going to get a "young boy that's there with him" to "say that he did it."

¶ 35 Moreover, the evidence against appellant was overwhelming, including: his spackling over dried blood in a blood-splattered room (blood which appellant claimed he did not see), the witness testimony

pointing to appellant as the killer, the DNA evidence and all of the other blood evidence found both inside the home and in appellant's garbage.

¶ 36 The investigator's testimony would not have been admissible. Since counsel cannot be held ineffective for failing to pursue a meritless claim, appellant's argument does not succeed. *Commonwealth v. Peterkin*, 538 Pa. 455, 649 A.2d 121, 128 (1994)

*Issue 6.*

■ ¶ 37 Appellant next asserts trial counsel ineffectiveness for not showing that Quillen bought a "maverick [model] pistol grip pump shotgun on July 10, 1996." Appellant's Brief, at 16. Appellant declares that this could have been proved by: the testimony of Detective Michael Novak; the testimony of Dennis Wilson (the manager of Lou's Jewelry and Pawn Shop); or the video tape that showed the purchase.

¶ 38 First, there is no evidence that any such video tape exists. To successfully plead the existence of such a tape, at a minimum appellant would have had to attach an affidavit from Wilson that swears to the fact. Nothing is attached and the claim thus fails.

¶ 39 Second, appellant was not prejudiced by the absence of either Wilson's or Detective Novak's testimony. In a signed memorandum, Detective Novak wrote that he visited Lou's Pawn Shop on August 21, 1997. His goal was to determine whether Quillen had purchased a shotgun under the alias "Andre Monroe," residing at 531 North Robinson Street. Wilson checked his records and found that an "Andre Monroe of 535 North Robinson Street" purchased a shotgun in his store approximately eight months before Williams' murder. Wilson, however, *could not identify* Quillen as the purchaser of the shotgun. Appellant's Exhibit "H."

¶ 40 Further, there is no evidence that that Quillen used the "address of his grandmother's house on N. Robinson Street" to purchase the weapon. Appellant's Brief, at 14. There simply is no affidavit from his grandmother that she lived at (either) North Robinson Street address during the time of the shotgun purchase. In fact, the only thing we have regarding the address of Quillen's grandmother is a memorandum, written by Quillen on May 22, 1997, stating that his grandmother resides at 5834 Catherine Street in Philadelphia. Appellant's Exhibit "F."

¶ 41 Appellant has thus made an insufficient plea of ineffectiveness. By failing to attach affidavits that tie everything together, appellant is not entitled to an evidentiary hearing on this issue and the claim of ineffectiveness was properly dismissed.

*Issue 7.*

■ ¶ 42 The seventh claim appellant brings to our Court is, actually, a hodgepodge of many separate, and very hard to understand, arguments. First, appellant argues that his counsel should have asked for an instruction telling the jury that "the DNA evidence that was presented by the Commonwealth in this case, was the 'Lowest Grade of Evidence' to have ever step foot in a Court of Law, and [must] not be considered during deliberations." Appellant's Brief, at 23. Seemingly, this argument focuses upon the fact that a mixture of both the victim's and appellant's DNA was found on the window blind and the fact that this was, after all, appellant's home (a place where appellant's DNA might have been found anywhere). In this case, however, appellant was not prejudiced by any failing of his trial counsel.

¶ 43 True, appellant's DNA might have been found anywhere in his home and, had the "window blind" evidence been the only

piece of evidence there was against appellant, *the argument could be made* that some type of cautionary instruction might have been warranted. Yet, this window blind was but one small piece of evidence in a case that had a plethora of both direct and circumstantial evidence pointing to appellant as the killer. Further, with respect to the "DNA mixture," the jury was fully aware that this was appellant's home and that appellant's DNA might have been innocently laid upon the window blind. N.T. Trial, 4/6/98, at 170–75. In fact, the Commonwealth's forensic scientist was extensively cross-examined on this very issue and appellant's trial counsel elicited the following concession from the scientist. During cross-examination, appellant's counsel asked the scientist, "let's say skin comes off my hand and falls into the blood and the blood was mixed up, would you see my DNA in that blood?" The scientist responded that you would indeed "expect to find a mixture" in such an instance. N.T. Trial, 4/6/98, at 173.

■ ¶ 44 As our Supreme Court has stated: "[i]t is the exclusive province of the jury, not the court, to decide all the facts, the inferences therefrom, the credibility of the witnesses and the weight and effect to be given to all of the testimony." *Commonwealth v. Romano*, 392 Pa. 632, 141 A.2d 597, 599 (1958). Here, the jury knew that appellant's DNA might have been innocently laid upon the window blind. It was then *up to the jury* to determine when, how and why appellant's DNA ended up on the blind mixed with the victim's. More importantly, however, with all of the other evidence that went against appellant, we are simply unable to say that counsel's failure to request a cautionary instruction for this one piece of evidence so prejudiced appellant as to lead to "a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different." *Pierce*, 786 A.2d at 213.

■ ¶ 45 The next claim appellant has forced under this heading is his trial counsel's ineffectiveness for failing to request a *Frye* hearing "to see if this type of Junk Science was even [accepted] within the scientific community." Appellant's Brief, at 23. This refers to the DNA mixture found on the window blind and, according to appellant, the DNA testing on the window blind was not scientifically accepted since his DNA would naturally be found in his own home. Not only does this argument fail logically, but it is also a misapplication of *Frye*.

■ ¶ 46 *Frye* requires that, before novel scientific evidence is admissible in criminal trials, the theories and methods of that evidence "must have gained general acceptance in the relevant scientific community." *Commonwealth v. Blasioli*, 552 Pa. 149, 713 A.2d 1117, 1119 (1998). The challenge appellant brings here does not question the type of DNA testing involved, but rather the mere fact that his DNA was found mixed with the victim's. That this mixture was found in appellant's house obviously made the evidence less damning to appellant's case. That, however, only goes to the respective "weight" the evidence was entitled; it has nothing whatsoever to do with the methods and theories of DNA testing.

¶ 47 Finally, appellant argues that the DNA evidence on the blinds should have been suppressed. He has not, however, even hinted at any suppression argument. The claim, if there is indeed any claim here, is waived.

*Issue 8.*

■ ¶ 48 Next, appellant argues ineffectiveness of counsel for failing to "present the bloody finger prints full hand and bloody palm print and blood that belonged

to the confessed killer, Elwood Quillen to the jury." Appellant's Brief, at 20. As was true immediately above, this claim is almost incomprehensible. According to the evidence presented at trial, the "bloody palm print" matched neither appellant nor his co-defendant, Keith Brown. Yet, this does not mean that the hand print was Quillen's; testimony showed that Ms. Kaciena Anderson and a friend helped clean the blood-splattered home. In fact, we have nothing in the record that shows the palm print was Quillen's and, without this, we cannot say that appellant's trial counsel should have presented the evidence. The claim does not have "arguable merit."

¶ 49 With respect to the bloody finger prints and "blood" appellant currently refers to, all are unsupported. The Commonwealth DNA-tested the blood splatters found in the home and none matched Quillen. Rather, all findings matched either the victim's or appellant's DNA.

*Issue 9.*

■ ¶ 50 Appellant's ninth issue asserts his trial counsel's ineffectiveness for not requesting immunity for Quillen's testimony. 42 Pa.C.S. § 5947 tells us who may request a grant of immunity. Subsection b declares:

*The Attorney General or a district attorney* may request an immunity order from any judge of a designated court, and that judge shall issue such an order, *when in the judgment of the Attorney General or district attorney:*

(1) the testimony or other information from a witness may be necessary to the public interest; and

(2) a witness has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

42 Pa.C.S. § 5947(b)(emphasis added).

■ ¶ 51 Thus, as this section makes clear, "courts have no power to grant im-

munity except on request of the prosecutor." *Commonwealth v. Johnson*, 507 Pa. 27, 487 A.2d 1320, 1322 (1985). In this case, appellant's trial counsel cannot be held ineffective for failing to request immunity for Quillen's testimony. Even if counsel did request immunity from the trial judge, the judge would have been able to do nothing. As is stated in § 5947, it is the prosecutor's decision that commands.

¶ 52 Moreover, and while this is almost beside the point, we cannot fathom any prosecutor requesting immunity for Quillen's testimony. As we explained above (in "Issue 5"), Quillen's "exculpatory" testimony was fraught with many extraordinarily serious reliability issues. Under such circumstances, Quillen's testimony would not have served the "public interest."

*Issue 10.*

■ ¶ 53 Appellant also takes issue with the prosecutor's decision to grant immunity to Kaciena Anderson, but not to Quillen. According to appellant, this was prosecutorial misconduct. It was not; rather, it was a decision the district attorney made and one that was within the D.A.'s discretion.

*Issue 11.*

¶ 54 Issue eleven argues trial counsel ineffectiveness for failing to request the trial be continued until after Quillen's own, separate murder trial. As appellant states:

As soon as Trial Counsel became aware of the fact that the Trial Judge was abusing his discretion by striking [Mr. Quillen] from the witness stand...Counsel if he were effective would have requested a continuance until after Mr. Quillen went to trial for those charges.

Appellant's Brief, at 34.

■ ¶ 55 At the time Quillen's testimony was struck, appellant's case was "nine

tenths of the way through the trial" and Quillen had not yet even been brought to trial. N.T. Trial, 4/7/98, at 19. Any continuance would have therefore been completely open-ended and, even on this appeal, we have no idea of when Quillen stood trial for his crime or whether he was found guilty or innocent. Moreover, and assuming Quillen was found guilty, his Fifth Amendment rights survived at least until he was sentenced for the conviction. *Mitchell v. United States,* 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999); *United States v. Lugg,* 892 F.2d 101, 103 (D.C.Cir.1989)(*stating*: "the convicted but unsentenced defendant retains a legitimate protectable Fifth Amendment interest in not testifying as to incriminating matters that could yet have an impact on his sentence.").

■ ¶ 56 Under such circumstances, it would have been error for the trial judge to grant the continuance appellant now seeks; had the continuance been granted, a huge amount of time would have elapsed between the stoppage and the resumption of the case. None of the jurors would have remembered what was even at issue after the resumption and the Commonwealth's case-in-chief would have been completely useless. While appellant takes issue with this statement, it must be remembered that the Commonwealth, too, is entitled to a fair trial. *Commonwealth v. Cosnek,* 575 Pa. 411, 836 A.2d 871, 878 (2003)(Castille, J. concurring).

¶ 57 Trial counsel was therefore not ineffective for failing to request a continuance in this instance; the request would have been fruitless.

### Issue 12.

■ ¶ 58 Appellant also argues that his trial counsel was ineffective for failing to request a mistrial when it became known that he was in jail prior to trial. The trial judge has adequately disposed of this claim:

> [Appellant] asserts that trial counsel was ineffective for failing to request a mistrial based on the introduction of evidence which tended to show that he was in prison prior to the time of trial. It is well established that it is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted. *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 638 (1995).

In the present case, Elwood Quillen testified that he killed Edward Williams. After Mr. Quillen was questioned about another murder charge, he invoked his Fifth Amendment rights. The court then held a hearing outside of the presence of the jury. The court dismissed the witness, struck his testimony, and issued a cautionary instruction to the jury to disregard Mr. Quillen's testimony. However, the jury did hear the testimony from Mr. Quillen confessing to the crime. Furthermore, the defendant had the opportunity to testify on direct examination that he walked into his home and saw a dead body [on] the floor of the living room. He further testified that he saw Mr. Quillen holding a shotgun.

The prosecutor then asked [appellant] on cross examination whether he had requested a prison cell with Mr. Quillen and whether [appellant] had Mr. Quillen to confess to the murder of Edward Williams. [Appellant] responded "no" to both questions. Thereafter, the Commonwealth called Mary Graham to testify that co-defendant Brown told her that he found a young boy in the correctional facility that said he would testify that he committed the murder.

[Appellant] claims that it was error for this court to allow evidence that [appellant] was in custody prior to and during the commencement of the trial. However, this evidence was properly admitted to rebut [appellant's] statements. Furthermore, [appellant] cannot show that he was prejudiced by the mere fact that the jury knew that [appellant] was in prison at some time prior to trial, especially in light of the overwhelming evidence against [him] in this case. Therefore, this claim is meritless.

Trial Court Opinion, 1/28/04, at 12.

### Issue 13.

■ ¶ 59 The thirteenth issue appellant brings before our Court asks whether his trial counsel was ineffective for not presenting appellant's financial ledgers to the jury. Appellant has attached evidence showing he had, about three months after the murder, settled a worker's compensation claim for $36,000 and had, on April 3, 1997, received a check for $352. As appellant states, this evidence would have rebutted the Commonwealth's stated motive for the murder: robbery.

¶ 60 First, the $36,000 settlement would have been at the very fringes of relevancy: appellant's former employer settled months *after* the murder was committed. Maybe it could be argued that the *expectation* of a settlement would have rebutted the motive for robbery, but, again that expectation is hardly weighty enough to say that without counsel's failings there is "a reasonable probability that . . . the outcome of the proceeding would have been different." *Pierce*, 786 A.2d at 213. This is especially true considering the testimony of Ms. Graham; her testimony showed that, at the time Williams met with appellant, appellant thought Williams was carrying $25,000.

¶ 61 The $352 check was also received after the murder of Williams. What is more important, however, is the fact that $352 pales in comparison to the $25,000 appellant was said to have thought Williams was carrying at the time of the robbery and murder. Thus, the mere fact appellant possessed a $352 check after the murder does not impinge upon the Commonwealth's robbery-motive theory.

### Issue 14.

■ ¶ 62 Appellant next asserts trial counsel's ineffectiveness for failing to call Karen Byrd and Deacon Jarvis Williams as alibi witnesses. The claims are meritless.

¶ 63 As the PCRA Court explained, there was good reason why Ms. Byrd was not called to testify:

> Trial counsel was not ineffective for failing to present Ms. Byrd as a defense witness at trial. According to his May 14, 2002 affidavit, trial counsel did not call Ms. Byrd because he was told first by [appellant] and later by Ms. Byrd herself that she did not want to testify. Indeed, Ms. Byrd told counsel she had lied in her interview and did not want to get into any trouble for that lie.

Trial Court Opinion, 1/28/04, at 4.

■ ¶ 64 Deacon Williams was, in fact, called as a witness and testified that appellant went to church on both Good Friday and Easter Sunday. This testimony does not, however, establish an alibi for the murder of Williams. There is a difference between a "general denial of guilt" and an alibi. *Commonwealth v. Roxberry*, 529 Pa. 160, 602 A.2d 826, 827 (1992). When the defendant generally denies his guilt, he is simply saying "I didn't do it." An alibi defense, on the other hand, not only declares "I didn't do it" but also says: "and it couldn't *possibly* have been me since I was someplace else when the crime occurred." This "someplace else" does not

have to be far away. Our Supreme Court has found alibi when the defendant testified he was one-half of a mile away from the crime scene at the time the crime occurred. *Roxberry*, 602 A.2d at 829. The Court has also declared an alibi existed when the defendant testified he was sleeping alone in his car at the time the crime occurred and where his car was parked ten miles away from where the victim's body was found. *Pounds*, 417 A.2d at 603. Alibi cannot be reduced to any "magic distance:" all depends upon whether evidence is introduced that "if believed, isolate[s] [the defendant] from all possible interaction with the victim and the crime scene." *Commonwealth v. Collins*, 549 Pa. 593, 702 A.2d 540, 545 (1997).

¶ 65 In appellant's case, the testimony of Deacon Williams did not isolate appellant "from all possible interaction with the victim and the crime scene." All that it showed was that appellant went to church on the night of March 28, 1997, and again on the morning of March 30, 1997. Yet, Williams was murdered either in the early morning hours of March 29, 1997 (as the Commonwealth argued), or before the Easter Sunday church service (as appellant's testimony implied).

### Issues 15 & 16.

¶ 66 In these issues, appellant argues trial counsel's ineffectiveness for failing to subpoena a variety of telephone records. Appellant writes:

> The Telephone Records from 5324 Greenway Ave (crime scene), and the phone records from 225 Greenway Ave, (home of the deceased), and Mr. Quillens Pager records would have clearly and conclusively shown this Honorable Court and the Jury at trial, that the decease[d] was out Ardmore Pa, an hour away from the crime scene [setting] up a date with

his partner Mr. Quillen to discuss their drug business.

Appellant's Brief, at 43–44.

■ ¶ 67 The meaning of all this is far from clear. The only way we can make sense of appellant's words is to read them to mean that Quillen called Williams' home on March 30, 1997, and then received a pager reply; supposedly this shows that Williams was alive when the page was made. It does not. As the PCRA Court explained:

> The evidence at trial concluded that the victim was killed sometime between the early-morning hours of Saturday, March 29, 1997 and the afternoon of March 30, 1997. Regardless of [appellant's] "proof" that the victim was alive on March 30, 1997 to receive an alleged phone call, this is not conclusive evidence of when the victim was murdered. Therefore, the timing of a phone call is meaningless.
>
> Furthermore, [appellant] has offered no evidence of the phone record, which must be produced to support his claim. Moreover, there is no way of knowing if the victim even received this phone call. Therefore, this claim is utterly meritless.

Trial Court Opinion, 1/28/04, at 10.

### Issue 17.

■ ¶ 68 Next, appellant attacks his trial counsel's effectiveness for allowing his character witnesses to be questioned as to whether they were aware of appellant's prior criminal trespass conviction. Appellant, however, opened the door to this specific conviction when he chose to present character witnesses.

¶ 69 According to appellant's prior employer, appellant is "truthful, he's honest and I trust him to be with me. I've never heard anybody say a bad thing about him." N.T. Trial, 4/6/98, 186. Thus, appellant's employer had an opinion that appellant

was honest, peaceful and of good character. After such testimony, the prosecution was completely entitled to test the basis of the employer's opinion, asking whether the employer was aware of appellant's specific, relevant "bad act." Pa.R.E. 405(a). Any objection by appellant's trial attorney would have been a meaningless gesture; the criminal trespass conviction was probative of the witness's opinion that appellant was honest. *Commonwealth v. Walker*, 384 Pa.Super. 562, 559 A.2d 579, 583 (1989) (stating: "criminal trespass is an offense in the nature of *crimen falsi*"). "Accordingly, as trial counsel had no meritorious basis on which to object ... this claim of ineffectiveness fails." *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 314 (2002).

¶ 70 If appellant did not wish the jury to hear this prior conviction, he should not have introduced character evidence. The choice, however, was entirely appellant's and now he simply has "no valid complaint at the latitude which existing law allows to the prosecution to meet by cross-examination an issue voluntarily tendered by the defense." *Michelson v. United States*, 335 U.S. 469, 485, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

## Issue 18 & 19.

¶ 71 Issue 18 has been previously litigated; issue 19 is waived. In appellant's eighteenth issue, he declares the trial court erred when it restricted his constitutional right to testify on his own behalf. We answered this claim in appellant's direct appeal. *Commonwealth v. Hall*, No. 1351 Philadelphia 1998, unpublished memorandum at 6 (Pa.Super. filed December 13, 1999).

¶ 72 The nineteenth issue is waived. According to appellant, the trial judge erred when he sustained a hearsay objection and disallowed the substance of John Costalas' testimony. This ruling meant that Costalas could not testify to certain statements appellant made to him. The claim was, however, cognizable on direct review and is waived in accordance with 42 Pa.C.S. § 9544(b).

## Issue 20.

¶ 73 Appellant brings two issues under this heading. With respect to Commonwealth witness Kaciena Anderson, appellant faults his trial counsel for failing to impeach her testimony by using: (1) her immunity agreement with the prosecution, and (2) her prior criminal record. (Ms. Anderson, it will be remembered, testified that she helped clean appellant's home of blood.)

¶ 74 Appellant's first sub-issue is meritless, the jury was well-aware of Ms. Anderson's immunity agreement. In fact, on direct examination, the prosecution emphasized her immunity agreement no less than four times and, therefore, any questions regarding this issue on cross-examination would have been merely cumulative of what she had already said. N.T. Trial, 4/6/98, at 90–91. Appellant cannot be said to have suffered prejudice in this instance; the ineffectiveness claim falls on its face.

¶ 75 As to Ms. Anderson's prior criminal convictions, the attached criminal history record shows that in 1995, Kaciena Anderson was convicted of two counts of simple assault and one count each of aggravated assault, recklessly endangering another person and possessing an instrument of a crime. Appellant now faults his attorney for failing to impeach Ms. Anderson with her violent past. The attorney, however, was not to blame: he could not have used these violent convictions to appellant's benefit.

¶ 76 Our Supreme Court has stated: "it is well settled that a witness may be impeached on the basis of a prior conviction

only if the crime involves dishonesty or false statement." *Commonwealth v. Penn,* 497 Pa. 232, 439 A.2d 1154, 1160 (1982). As appellant is himself aware, Ms. Anderson's convictions were for crimes of violence, not of falsity or deceit. Since they do not "reflect[ ] upon the veracity" of Ms. Anderson, they could not have been used to impeach her testimony; appellant's ineffectiveness claim has no arguable merit. *Commonwealth v. Phillips,* 272 Pa.Super. 16, 414 A.2d 646, 647 (1979).

### Issue 21.

■ ¶ 77 The twenty-first issue currently before our Court is another ineffectiveness claim. Appellant argues trial counsel error in failing to "request that the Court instruct the jury to receive Anderson's immunized testimony with caution, as her testimony comes from a corrupt polluted and tainted source." Appellant's Brief, at 52. There was, however, no evidence that Kaciena Anderson had anything to do with any of the crimes for which appellant was charged.[2] *Commonwealth v. Sisak,* 436 Pa. 262, 259 A.2d 428, 431 (1969) (*stating:* "The general rule for determining whether a witness is an accomplice is 'whether or not he could be indicted for the crime for which the accused is charged.' ").

¶ 78 The crime for which Ms. Anderson was immunized arose in connection with her helping to clean the apartment of blood; yet this action occurred well after appellant had abused Williams' corpse. Here, no accomplice charge was warranted "the testimony at trial did not establish that [Ms. Anderson] actively participated in the crime[s]. At most, it showed that

[Ms. Anderson] was an accessory after the fact and not an accomplice." *Commonwealth v. Derk,* 553 Pa. 325, 719 A.2d 262, 266 (1998)(*plurality* ). Appellant's ineffectiveness claim has no merit.

### Issue 22.

¶ 79 Appellant also argues that the Commonwealth committed a *Brady* violation when it failed to turn over Kaciena Anderson's criminal history report. Even if this issue is properly before our Court, it is meritless. As we stated above, appellant could not impeach Ms. Anderson with any of her prior convictions as they did not involve dishonesty. Appellant was not prejudiced by any *Brady* violation.

### Issue 23.

¶ 80 Appellant's twenty-third issue is another ineffectiveness claim for failing to request an accomplice instruction. This time the alleged accomplice was Mary Elizabeth Graham. It is an absurd claim; Ms. Graham had nothing to do with any of the crimes for which appellant was charged.

### Issue 24.

■ ¶ 81 In issue twenty-four, appellant declares his trial counsel ineffective for failing to file a motion to sever his case from Brown's. The Commonwealth, however, alleged that appellant and Brown conspired to rob and kill Williams. When a conspiracy is alleged, the "co-defendants should be tried together;" a separate trial for co-defendants should only be granted where the two defenses are "irreconcilable and exclusive" and "conflict at the core." *Commonwealth v. Presbury,* 445 Pa.Super.

---

2. The "criminal conspiracy" charge did not extend to the attempt to clean the house. The cleaning, of which Ms. Anderson admitted to participating, occurred over a week after the murder and, as the trial judge made clear, the criminal conspiracy charge asked only whether there was a conspiracy to "rob, shoot and

kill Edward Williams." N.T. Jury Charge, 4/8/98, at 76. We make further note of the fact that, when Ms. Anderson first walked into the house over Easter weekend appellant blocked her access to the upstairs "middle bedroom" (where the murder occurred).

362, 665 A.2d 825, 827 (1995). Throughout almost all of the trial, the defenses of appellant and Brown were identical: both claimed Quillen was the murderer of Williams. A severance motion would have been denied; trial counsel ineffectiveness therefore cannot be proved.

¶ 82 In arguing that severance was necessary, appellant points to testimony made by Ms. Graham where she stated: "It's a young boy that's there with him and Rob, where he was, and he's there on other charges, but he's going to say that he did it. He's going to say that he did it because they're trying to pin it on Keith and Rob." N.T. Trial, 4/7/98, at 125. According to appellant, the Commonwealth was able to introduce this prejudicial statement only because of the joint trial; in other words, appellant argues that the statement would not have been admissible in his own, separate trial. This is, however, incorrect; the statement was admissible as rebuttal to appellant's own testimony.

*Issue 25.*

¶ 83 Appellant's final issue accuses the PCRA Court of negligence; according to appellant, the "PCRA Court adopted the Commonwealth's motion to dismiss word for word." Appellant's Brief, at 66. Appellant's assertion is untrue: the trial judge's opinion shows he possessed a thorough understanding of the case and the claims appellant raised.

■ ¶ 84 In any event, the disposition of appellant's petition simply does not require any new independent factual findings; all can be resolved on the record. Thus, even if the trial judge failed to provide a 1925(a) opinion we would still be "within [our] rights not to order a remand." *Otte v. Covington Twp. Rd. Supervisors,* 539 Pa. 44, 650 A.2d 412, 414 (1994). Appellant's claim against the PCRA Court is meritless and does not afford him any relief.

### *Conclusion*

¶ 85 In conclusion, all of appellant's claims fail. With respect to his ineffectiveness claims, since appellant cannot show that his trial counsel was ineffective, his claims of appellate counsel ineffectiveness have no arguable merit.

¶ 86 Order AFFIRMED.