J-S28019-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TODD V. CALHOUN, | |
| Appellant | No. 1205 MDA 2014 |

Appeal from the PCRA Order entered June 20, 2014,
in the Court of Common Pleas of York County,
Criminal Division, at No(s): CP-67-CR-0006309-2009

BEFORE:  BOWES, ALLEN, and LAZARUS, JJ.

MEMORANDUM BY ALLEN, J.:                          **FILED JUNE 05, 2015**

Todd V. Calhoun ("Appellant") appeals from the order denying his petition for post-conviction relief filed pursuant to the Post Conviction Relief Act ("PCRA").  42 Pa.C.S.A. §§ 9541-46.  In addition, PCRA counsel has filed a petition to withdraw.  We affirm.

We previously detailed the pertinent facts and procedural history as follows:

> On July 26, 2009, Officer Lisa Daniels of the York City Police Department responded to a radio report of a shooting in the area of Smyser Street in York County.  On arriving at the scene, Officer Daniels observed the victim, Shawn Bailey, lying face down in the street, having sustained three gunshot wounds.  Witnesses to the shooting reported to police that they saw three or four men in a black Jeep and red Saturn shoot at the victim, and identified Appellant as being among the shooters.  Police officers subsequently arrested and charged Appellant with [aggravated assault and related] crimes.  The Commonwealth requested numerous continuances of

trial which the trial court granted, and on July 30, 2010, Appellant filed a motion pursuant to Pa.R.Crim.P. 600 seeking dismissal of the charges against him for failure of the Commonwealth to bring him to trial within 365 days. The trial court denied Appellant's Rule 600 motion on August 5, 2010. A jury trial commenced on August 9, 2010, and on August 11, 2010, the jury returned its guilty verdict.

\*\*\*

At trial, Diamond Bailey, the victim's sister, testified that at the time of the shooting, she was standing on Smyser Street with the victim and saw four men, one of whom was Appellant, on the street together near a red two-door sedan and a black jeep. She testified that she heard Appellant say "this is what we do", and immediately thereafter the victim was shot. Ms. Bailey testified that she saw two of the men who were standing with Appellant fire guns at the victim. While Ms. Bailey stated that she did not actually see Appellant fire a gun at the victim, she stated that she witnessed the shots being fired from the group of men whom Appellant was with. Ms. Bailey testified that after the shooting stopped, one of the men came back and "picked up [the victim's] hat, I guess like a souvenir to show that they shot him, and took off with his hat."

Rachel Garner, a witness to the shooting, testified that she was in her apartment when she heard Appellant and the victim arguing. She then looked out of her window and saw Appellant and the victim standing right in front of each other, having a disagreement. She stated that immediately following the argument, she heard gunfire and saw the victim being shot at, though she did not know precisely who fired the shots. She stated that after the shooting began, she saw the victim fire a weapon at Appellant.

Lachara Wintermeyers also testified at trial. Ms. Wintermyers explained that Appellant is the father of her son, and that prior to the shooting, she had been in a relationship with the victim. She further testified that on at least one occasion prior to the shooting, Appellant had expressed disapproval of her relationship with the victim,

- 2 -

and asked Ms. Wintermyers if she was going to make him "fuck this nigga up" and/or "pop this nigga", referring to the victim. Ms. Wintermyers testified that on the day of the shooting, Appellant had called the victim and told him to "leave Lachara alone."

The victim testified at trial that on the date of the incident, he was walking towards Smyser Street when he received a telephone call from Appellant in which Appellant informed the victim that he was waiting for him on Smyser Street. On arrival at the scene, the victim observed Appellant standing in the middle of the street. Two other unidentified men then drove up and stepped into the street. Appellant made eye contact with the two other men, who split up on either side of the street and began walking towards the victim. Appellant and the victim began to argue, after which Appellant said, "this is what we do" and immediately thereafter, the victim heard gunshots being fired at him. The victim testified that he saw Appellant's companions shoot at him, but did not know whether or not Appellant fired a weapon at him. The victim further testified that prior to the shooting, he received threats from Appellant warning him to stay away from Ms. Wintermyers.

Detective George Ripley of the York City Police testified that he interviewed Appellant on August 11, 2009. Detective Ripley testified that during the interview, Appellant reported that on the date of the incident he telephoned the victim and told him to "leave Lachara alone." Later that afternoon, Appellant again called the victim, and then, along with a companion named "C-Murder", drove to Symser Street, in a red Saturn, to meet the victim. Appellant stated to [Detective] Ripley that prior to arriving on Smyser Street, he made a telephone call to an individual named Brad [Markle], informed Mr. [Markle] that he was going to meet the victim on Smyser Street, and asked Mr. [Markle] to "get his back." Appellant stated that on the way to Smyser Street he "took off his earrings and his hat, in preparation to fight" with the victim, but that upon arriving at Smyser Street, the victim appeared with a weapon and shot at Appellant. Appellant stated that during the time the shooting occurred, he did not know that Mr. [Markle] was firing a weapon. Appellant

> additionally denied having a gun or shooting a gun on the date of the incident.

*Commonwealth v. Calhoun*, 38 A.3d 92 (Pa. Super. 2011), unpublished memorandum at 1-2; 8-11 (footnote and citations omitted).

Following a two-day trial, on August 11, 2010, a jury convicted Appellant on all charges. Thereafter, Appellant filed post-trial motions that the trial court denied on November 24, 2010. That same day, the trial court sentenced Appellant to an aggregate term of 5½ to 11 years of imprisonment. Appellant filed a timely appeal to this Court. On November 4, 2011, we rejected Appellant's substantive claims and affirmed his judgment of sentence. *Calhoun*, *supra*. On September 17, 2012, our Supreme Court denied Appellant's petition for allowance of appeal. *Commonwealth v. Calhoun*, 53 A.3d 756 (Pa. 2012).

On September 9, 2013, Appellant filed a *pro se* PCRA petition, and the PCRA court appointed counsel to represent him. PCRA counsel filed an amended PCRA petition on November 6, 2013, in which he claimed that trial counsel was ineffective for failing to call Brad Markle as a defense witness. The Commonwealth filed its response on April 16, 2014. On June 20, 2014, the PCRA court held an evidentiary hearing at which Mr. Markle, Appellant, and trial counsel testified. At the conclusion of the PCRA hearing, the PCRA court entered an order denying Appellant's amended petition. This timely appeal followed. Both Appellant and the PCRA court have complied with Pa.R.A.P. 1925.

In lieu of an advocate's brief, Appellant's counsel has filed a purported **Anders**[1] brief and a petition to withdraw. Compliance with **Anders** applies to counsel who seeks to withdraw from representation on direct appeal. **Anders** imposes stricter requirements than those imposed when counsel seeks to withdraw during the post-conviction process pursuant to **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988), and **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*). **See Commonwealth v. Fusselman**, 866 A.2d 1109, 1111 n.3 (Pa. Super. 2004). Thus, we will assess counsel's assertion that the issues Appellant wishes to raise have no merit under a **Turner**/**Finley** analysis.

This Court has recently explained:

> The **Turner**/**Finley** decisions provide the manner for [PCRA counsel] to withdraw from representation. The holdings of those cases mandate an independent review of the record by competent counsel before a PCRA court or appellate court can authorize an attorney's withdrawal. The necessary independent review requires counsel to file a "no-merit" letter detailing the nature and extent of his review and list each issue the petitioner wishes to have examined, explaining why those issues are meritless. The PCRA court, or an appellate court if the no-merit letter is filed before it, **see Turner**, **supra**, then must conduct its own independent evaluation of the record and agree with counsel that the petition is without merit. . . .
>
> [T]his Court [has] imposed additional requirements on counsel that closely track the procedure for withdrawing on direct appeal. . . . [C]ounsel is required to contemporaneously serve upon his [or her] client his [or her] no-merit letter and application to withdraw along with

---

[1] **Anders v. California**, 386 U.S. 738 (1967).

> a statement that if the court granted counsel's withdrawal request, the client may proceed pro se or with a privately retained attorney. . . .

**Commonwealth v. Reed**, 107 A.3d 137, 140 (Pa. Super. 2014) (citation omitted).

Here, counsel has substantially complied with the mandates of **Turner** and **Finley**, as summarized in **Reed**, **supra**. "Accordingly, we will proceed with our independent review of the questions presented to determine if counsel correctly concluded that the issues raised had no merit." **Reed**, 107 A.3d at 141.

This Court's standard of review regarding an order dismissing a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. **Commonwealth v. Halley**, 870 A.2d 795, 799 n.2 (Pa. 2005). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. **Commonwealth v. Carr**, 768 A.2d 1164, 1166 (Pa. Super. 2001). Moreover, a PCRA court may decline to hold a hearing on the petition if the PCRA court determines that the petitioner's claim is patently frivolous and is without a trace of support in either the record or from other evidence. **Commonwealth v. Jordan**, 772 A.2d 1011 (Pa. Super. 2001).

In his sole claim raised on appeal, Appellant maintains that trial counsel was ineffective for failing to call Mr. Markle to testify as a defense

witness. *See* Appellant's Brief at 4. In order to establish that trial counsel was ineffective for failing to investigate and/or call a witness at trial, a PCRA petitioner must demonstrate that:

> (1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant.

*Commonwealth v. Hall*, 867 A.2d 619, 629 (Pa. Super. 2005) (citation omitted).

Here, the PCRA court summarized the testimony from the evidentiary hearing as follows:

> At the PCRA hearing in this case, trial counsel [] testified that one of the reasons why he did not call Bradley Markle to testify was that Mr. Markle's statement totally contradicted what [Appellant] told Detective Ripley. Mr. Markle's notarized Affidavit presented to the [PCRA] Court in support of the PCRA Petition (Attached to the Petition as "Exhibit A"), as well as his testimony at the PCRA hearing, indicates that Mr. Markle **just happened** to see [Appellant] in another vehicle while driving down the street, tried to get [Appellant] to stop in the hopes of collecting some money that was owed to Mr. Markle by [Appellant], but before Mr. Markle could talk with [Appellant], [the victim] approached holding a gun and started firing at [Appellant]. Mr. Markle further testified that [Appellant] did not call him to meet for a fight or an altercation with another person. This version of events by Mr. Markle contradicts not only [Appellant's] statements to Detective Ripley, but also contradicts the version of events Mr. Markle, as a co-defendant, gave when he pled guilty to Recklessly Endangering Another Person before the Honorable Stephen P. Linebaugh.

Trial Court Opinion, 10/10/14, at 2-3 (citations to notes of testimony omitted).

The PCRA court then quoted from Mr. Markle's guilty plea colloquy, noting that Mr. Markle admitted that he was "aware that some type of confrontation was going to occur and that eventually shots were fired." *Id.* at 3 (quoting N.T., 7/12/10, at 6). During the colloquy, Mr. Markle further admitted that he "got a phone call about another case, and I went to help a friend out." *Id.* The PCRA court attached a copy of Mr. Markle's guilty plea colloquy to its Pa.R.A.P. 1925(a) opinion.

The PCRA court then concluded:

> **This version** of events as told by Mr. Markle is consistent with the statement [Appellant] made to Detective Ripley on August 11, 2009. During this interview with Detective Ripley, [Appellant] stated that prior to the shooting incident, he called Mr. Markle and advised him where he was going, that he was going to see this guy, or see the dude, and that he asked Mr. Markle "to get his back."
>
> However, the version of events as told by Mr. Markle under oath during his guilty plea was **inconsistent** with the Affidavit in support of [Appellant's] PCRA and his testimony at the PCRA hearing. The [PCRA] Court questioned Mr. Markle at the hearing about this inconsistency, and Mr. Markle's responses in that regard did nothing to explain why his versions differed.
>
> This guilty plea under oath by Mr. Markle to Recklessly Endangering Another Person was another reason [trial counsel] gave at the hearing for his decision not to call Mr. Markle to testify. Specifically, if [trial counsel] had called Mr. Markle to testify, he was concerned that the Commonwealth would cross-examine Mr. Markle about why, if this is self-defense, did he plead guilty to anything.

In addition, [trial counsel] testified that he was concerned that the jury would not necessarily believe that Bradley Markle just happened to get [to the scene] at the precise moment when [the victim] came out firing, indicating that it would be quite a coincidence, especially given [Appellant's] statement to Detective Ripley.

Given that Mr. Markle's Affidavit in support of [Appellant's] PCRA and his testimony at the PCRA hearing contradict both his guilty plea **under oath** and [Appellant's] statement to Detective Ripley, calling Mr. Markle as a witness at [Appellant's] trial was not only not necessary to avoid prejudice, but the likelihood was great that it would have been prejudicial to [Appellant]. As a result, [trial counsel] was not ineffective for not calling Bradley [Markle] to testify.

PCRA Court Opinion, 10/10/14, 3-5 (citations to notes of testimony omitted).

Our review of the certified record supports the PCRA court's conclusion. In particular, we note the following exchange between PCRA counsel and trial counsel:

Q. Why was Mr. Markle initially - - why did you wish to have him testify as a witness?

A. He may have been good for us if they had not introduced [Appellant's] statement that he gave to Detective Ripley, that's one reason, because [Mr. Markle's proposed testimony] totally contradicted what [Appellant] had told Detective Ripley.

Number two, you know, I – the way the trial went, I thought it went pretty well. I mean, you know, when you asked me the question, I will tell you why I didn't call [Mr.] Markle, but - -

[PCRA COUNSEL]: I'm getting - - but - -

THE COURT: Well, why don't we just ask the question. Why didn't you call Bradley Markle?

[PCRA COUNSEL]: I was trying to first get into why he thought his testimony would be beneficial with regards to the charges, but I think he just did that.

BY [PCRA COUNSEL]:

Q. So why did you not call Mr. Markle?

A. Yeah, I mean, I had him available because, you know, I didn't know exactly - - well, I thought I knew what was going to happen at trial, but, you know, sometimes things happen.

The reason I didn't call Brad Markle is, as I just said, number one, things appeared to be going pretty well for us as far as any kind of self-defense claim. I didn't think [the victim] came off particularly well, now one of the other witnesses. I don't remember her name. Again, [Appellant] gave a - - Mr. Markle testified here today that it was just happenstance that he ran into [Appellant] down at the area where this occurred. What [Appellant] told Detective Ripley is that [Appellant] had called Brad Markle and told Brad Markle or requested him to come down to that location to get his back, that he was going to see some dude, and he wanted Brad Markle there to get his back.

If I would have introduced - - well, if I put [Mr.] Markle up, that's totally going to contradict what my client said, you know, and it did come out through a statement to Ripley exactly what [Appellant] said, that [Appellant] didn't do anything, that [Appellant] got there and [the victim] came out firing, and that [Appellant] didn't have a gun so he had exculpatory information in his statement. That way I didn't have to put [Appellant] on the stand to testify at the trial.

But again, [Mr. Markle's proposed testimony] would have totally contradicted what [Appellant] said. You know, quite frankly, I was concerned the jury would not necessarily believe that Brad Markle just happens to get there at the precise moment when [the victim] comes out firing. That's quite a coincidence especially given [Appellant's] statement. And I think it was Lachara Wintermeyers who testified at trial, who was with

- 10 -

[Appellant], who, if I recall said that he called or was making phone calls on her phone.

You know, [the prosecutor's] theory of the cases was [] [Appellant] indicated he didn't have a gun. His theory was he didn't really care if [Appellant] had a gun or not, that he orchestrated, [Mr.] Markle, the third guy and him to be there knowing there was going to be a confrontation, and, therefore, accomplice liability, [Appellant] should be found guilty anyway whether or not he had a gun.

You know, lastly, with [Mr.] Markle, he pled guilty to recklessly endangering. [The PCRA court] referenced [Mr. Markle's] guilty plea. I had a concern too that [the prosecutor] would confront [Mr. Markle], well, if this is all self-defense, then why did you plead to anything; so, you know, I made the decision based upon those factors that I just wasn't going to call Brad Markle.

N.T., 6/20/15, at 44-47.

Upon cross-examination, the following exchange occurred between the assistant district attorney and trial counsel:

Q. Just to reiterate some things. Is it accurate to say that the reason you didn't call Bradley Markle is he would have undercut your case as you were going to be arguing?

A. Yeah, I guess that's one way to put it.

*Id.* at 49.

The PCRA court credited the testimony of trial counsel over the testimony and other allegations made by Appellant at the evidentiary hearing. We cannot disturb this determination. *See Commonwealth v. Battle*, 883 A.2d 641, 648 (Pa. Super. 2005) (explaining that credibility determinations are solely within the province of the PCRA court). Moreover,

given the PCRA court's credibility determinations, Appellant cannot establish that the absence of Mr. Markle's testimony prejudiced him. **Hall**, **supra**.

In sum, we have reviewed the record, including the notes of testimony from the PCRA hearing, and agree with PCRA counsel's determination that Appellant's ineffectiveness claim is without merit. We therefore affirm the PCRA court's denial of Appellant's petition for post-conviction relief, and grant counsel's petition to withdraw.

Order affirmed. Petition to Withdraw granted.

Judge Lazarus joins the Memorandum.

Judge Bowes files a Concurring Memorandum.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/5/2015