J-S30032-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| EDWARD SCOTT | |
| Appellant | No. 2286 EDA 2013 |

Appeal from the Judgment of Sentence July 2, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006350-2011

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                    **FILED JULY 29, 2015**

A jury found Edward Scott guilty of robbery,[1] conspiracy,[2] robbery of a motor vehicle,[3] and possession of an instrument of crime.[4] The trial court sentenced Scott to a total of 10-20 years' imprisonment followed by 10 years of probation.

In this timely direct appeal, Scott argues that the trial court erred in denying his request for an alibi instruction and his motion to suppress the

_____

[1] 18 Pa.C.S. § 3701.

[2] 18 Pa.C.S. § 903.

[3] 18 Pa.C.S. § 3702.

[4] 18 Pa.C.S. § 907.

1

complainant's identification testimony. Both Scott and the trial court complied with Pa.R.A.P. 1925. We affirm.

The trial court summarized the evidence as follows:

> On May 18, 2011, William Jackson drove his girlfriend Jessica Blair and her son to her home. Jackson was driving his milk-white, 1976 Chevrolet Impala, which was customized with distinctively large 26" tires and rims. When Jackson pulled up to Blair's home at 1379 Narragansett Street in Philadelphia, he double-parked his vehicle and walked Blair and her son to the front door. Blair and Jackson talked on the porch for several minutes. During their conversation, Jackson noticed two men — defendant Scott and co-defendant Williams — walking down the street. Williams and Scott stopped walking when they reached Jackson's car, and then stood there talking for approximately five minutes. They were approximately ten to fifteen feet from Jackson, who was on the porch. Jackson ended his conversation with Blair and then walked down the porch steps toward his vehicle.
>
> As soon as Jackson reached the bottom of the steps, [] Williams approached Jackson and pulled out a black and silver semi-automatic handgun. [] Scott followed close behind. Williams pointed the gun in Jackson's face and told him to get on the ground, lay face-down on his stomach, and hand over his money. Jackson complied by [lying] on the ground. Williams then put the gun to the center of the back of Jackson's head. [] Scott was standing directly behind Williams. Williams removed a wallet from Jackson's back pocket, and told [] Scott to jump in Jackson's car and drive off. [Scott] stepped over Jackson, entered Jackson's vehicle, and drove toward Stenton Avenue. Even though he was [lying] on the ground, Jackson observed [Scott] drive Jackon's Impala down Narragansett Street and turn right onto Stenton Avenue. [] Williams told Jackson not to move. Williams then walked away in the same

- 2 -

direction as [] Scott, and then turned right on Stenton Avenue.

After [] Williams walked away, Jackson got up off the sidewalk and walked inside Blair's house. Once he entered the house, Jackson called police using Blair's phone; the police arrived a few minutes later. Jackson provided descriptions of both men: 'the one gentleman with the gun had on a dark gray hoodie and dark pants, light-skinned, goatee, kind of stocky. The other person that drove off in the vehicle was dark-skinned, slim, maybe a little bit taller.' Jackson testified that he remembered the faces 'very well' and that there were several street and porch lights on in the area. Police conveyed over police radio the descriptions of both defendants and a description of the stolen car.

Sergeant Daniel Ayres and Officer Michael Bransfield were responding to the police radio call when they passed Jackson's distinctive Impala two blocks away from the scene of the crime at the corner of Crittenden and Price. The officers observed the Impala parked poorly, with the headlights and interior lights left on, and the keys on the ground in the middle of the street outside of the driver's side door. [] Scott was near the Impala walking away from the driver's side door of the car. The Officers stopped [Scott] for investigation pending identification by Jackson.

Officers Justin O'Brien and Fred MacConnell stopped [] Williams on the 6500 block of Wister Street, just one block from the scene of the crime. Williams was walking down Wister Street looking over his shoulder. When the Officers turned their car around, Williams had stopped walking and was now sitting on the steps of a house along Wister Street. Williams claimed that he lived there when asked by Officer O'Brien, but he did not know the address of the house or the name of the street. The Officers held Williams for investigation pending identification by Jackson. Officers Brandon Bryant and Kevin Cahill transported Jackson to a total of three locations to

- 3 -

make possible identifications. At the first location, Jackson identified the Impala stopped by Officers O'Brien and MacConnell as his customized Impala. He then positively identified [] Scott as the individual who stole his Impala. Jackson testified that [Scott]'s facial hair stood out, and he remembered 'his face, dark skin, his height, his stature, even the clothing he had on.' At the second location, Jackson was provided the opportunity to make an identification of someone the police had stopped in the area. Jackson told the officers that this second person was not involved in the robbery. Jackson was then taken to a third location, where he identified [] Williams as the gunman who pointed the gun at his head and took his wallet. Jackson testified that he would not forget Williams's face and stature. Approximately ten minutes passed from the time he was robbed until he identified [] Scott and Williams. Jackson testified that he had no doubt about his identifications of [] Scott and Williams and that he would never forget the day that he was robbed.

Pa.R.A.P. 1925(a) Opinion, at 1-4 (citations omitted).

Scott raises two issues in this appeal:

> 1. Did not the lower court err by refusing to instruct the jury as to [Scott]'s alibi defense, when [Scott] had presented unequivocal alibi testimony that [he] was elsewhere at the time of the alleged crime, such that [his] evidence may have been sufficient to raise a reasonable doubt as to his guilt?
>
> 2. Did not the lower court err in denying [Scott]'s motion to suppress identification testimony, where the circumstances of the out-of-court identification by complainant William Jackson were unduly suggestive, and where the in-court identification did not have an independent origin sufficient to purge the primary taint of the out-of-court identification?

Brief For Appellant, p. 4.

Scott first argues that the trial court erred by denying his request for an alibi instruction because he presented evidence that he was watching a basketball game with his aunt at the time of the robbery. When giving jury instructions, the trial court has broad discretion in phrasing the instructions so long as the instructions given "clearly, adequately, and accurately" reflect the law. **Commonwealth v. Lesko**, 15 A.3d 345, 397 (Pa.2011). When reviewing the trial court's decision not to give a jury instruction, we examine the charge in its entirety to determine if it accurately and fairly set forth the law to the jury. **Commonwealth v. Ogrod**, 839 A.2d 294, 331-32 (Pa. 2003). There is no error in failing to give a specific charge when the trial court provides a full and complete charge. **Commonwealth v. Vincens-Rodriguez**, 911 A.2d 116, 120 (Pa.Super.2006). We will reverse a trial court's instruction only when it abuses its discretion or commits an error of law. **Commonwealth v. Galvin**, 985 A.2d 783, 798-99 (Pa.2009).

An alibi is "a defense that places the defendant at the relevant time at a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." **Commonwealth v. Mikell**, 729 A.2d 566, 570 (Pa.1999). The purpose of an alibi instruction is to ensure that the jury understands where the burden of proof lies. There is a danger that the jury will incorrectly view the defendant as accepting the burden of proof of demonstrating that the alibi is true, when in fact the burden lies, as always, with the Commonwealth to prove guilt beyond a

reasonable doubt. The alibi instruction is given to correct any such misapprehension. ***Commonwealth v. Collins***, 702 A.2d 540, 544-45 (Pa.1997). An alibi instruction is necessary only in cases where a defendant's evidence places him at the relevant time at a different place than the scene involved and so far removed therefrom as to render it impossible for him to be the guilty party. ***Id***. at 545.

Scott based his request for an alibi instruction on the testimony of his aunt, Brenda Scott ("Brenda"), with whom Scott was living at the time of the crime. N.T. 2/6/13, Vol. 3, at 9. Brenda testified that she is a big fan of the Boston Celtics, a professional basketball team, and on the night of the robbery, May 18, 2011, she was in her bedroom watching the Celtics play in the "Final Four." ***Id.*** at 10, 16. "The only time I watch basketball," Brenda stated, "is when the Celtics are playing; the Celtics or the [Philadelphia 76ers]." ***Id.*** at 18. Scott is also a big Celtics fan, Brenda said, and he stopped in her bedroom during the game between 10:35 p.m. and 10:55 p.m., a time period close to or overlapping with the robbery. ***Id.*** at 11, 16, 19. Brenda eventually conceded, however, that the Celtics were not playing on the night of May 18th. ***Id***. at 18. The only game that night was between the Dallas Mavericks and the Oklahoma Thunder. ***Id***. In fact, the Celtics had been eliminated from the NBA[5] playoffs on May 11, 2011, one week

---

[5] National Basketball Association.

earlier, and the 76ers had been eliminated from the playoffs on April 27, 2011, almost three weeks earlier.[6]  Thus, Brenda's testimony was not sufficient to place Scott at a different place than the scene of the crime *at the relevant time*.[7]  *Cf. Commonwealth v. Hall*, 867 A.2d 619, 636-37 (Pa.Super.2005) (in murder trial, trial counsel not ineffective for failing to call church deacon as alibi witness, where deacon testified that defendant went to church on both Good Friday and Easter Sunday, evidence established victim was killed either on Saturday before Easter or before Easter Sunday church service, and thus deacon's testimony did not isolate defendant from all possible interaction with victim and crime scene).

The two decisions relied upon by Scott -- *Commonwealth v. Pounds*, 417 A.2d 597 (Pa.1980), and *Commonwealth v. Roxbury*, 602 A.2d 826 (Pa.1991) – are easily distinguishable.  In *Pounds*, the defendant was charged with committing a murder that took place between 6:00 a.m. and

_____

[6] We take judicial notice of these elimination dates under Pa.R.E. 201, because they are listed on multiple websites (e.g., basketball-reference.com, nba.com, espn.go.com, wikipedia.org/wiki/2011_NBA_playoffs) whose accuracy on this subject cannot reasonably be questioned.

[7] Further undermining Brenda's testimony is her claim that she was watching the Celtics play in the "Final Four".  The "Final Four" virtually always refers to the semifinals in the annual NCAA Men's Division I Basketball Championship, one of the most popular events in American sports.  It less frequently refers to the semifinals in the annual NCAA Women's Division I Basketball Championship.  On the other hand, other than Brenda's testimony, we know of no occasion in which this phrase has been used in connection with professional basketball games.

7:00 a.m. The defendant testified that he was asleep in his car at a different location from the previous evening until sometime before 8:00 a.m. on the morning of the murder and drove to his mother's house. Our Supreme Court held that the defendant's testimony entitled him to an alibi instruction, because it placed him at locations distinct from the crime scene during the relevant time period. *Id*., 417 A.2d at 602. Similarly, in **Roxbury**, our Supreme Court held that a new trial was necessary where the trial court denied the defendant's request for an alibi instruction despite his testimony that he was one-half mile from the crime scene at the time of the murder. Here, in contrast, Brenda's testimony did not isolate Scott from the crime scene at the time of the robbery. Her testimony identified Scott's whereabouts on an entirely different day (possibly May 11, 2011).

In his second argument on appeal, Scott contends that the trial court improperly denied his motion to suppress William Jackson's identification at the scene of Scott's arrest because the procedure was overly suggestive. The standard of review in an appeal from an order denying a motion to suppress is as follows:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.

- 8 -

> Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

***Commonwealth v. Jones***, 988 A.2d 649, 654 (Pa.2010).

A trial court should evaluate the totality of the circumstances when reviewing a motion to suppress an out of court identification. ***Commonwealth v. Freeman***, 827 A.2d 385 (Pa.2003). Although suggestiveness in the identification process is relevant, "suggestiveness alone does not warrant exclusion." ***Commonwealth v. Fulmore***, 25 A.3d 340, 346 (Pa.Super.2011). The court must also examine the opportunity of the witness to view the perpetrator at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. ***Commonwealth v. Wade***, 33 A.3d 108, 114 (Pa.Super.2011). The court must weigh these factors against the corrupting effect of any suggestiveness. ***Id***. The court should not suppress identification evidence unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." ***Fulmore***, 25 A.3d at 346.

The purpose of a "one on one" identification is to enhance reliability by reducing the time elapsed after the commission of the crime. ***Wade***, 33 A.3d at 114. Absent some special element of unfairness, a prompt "one on

one" identification is not so suggestive as to give rise to an irreparable likelihood of misidentification. *Id*.

In this case, there was no special element of unfairness that rendered the one-on-one confrontation unduly suggestive. The evidence at the suppression hearing established that the victim, Jackson, had a good opportunity to observe Scott prior to and at the time of the crime. Jackson was standing on his girlfriend's porch when he saw Scott and Williams walk down the street in his direction. Scott and Williams stopped near where Jackson had parked his car, within ten feet of where Jackson was standing. For the next ten minutes, Scott and Williams stood there while Jackson continued to speak with his girlfriend. Although it was nighttime, there was lighting from street lights and the porch light. N.T. 2/4/13, at 15-17, 29.

After ten minutes passed, Jackson stepped off of his girlfriend's porch and walked toward his car. Scott and Williams confronted him, and Jackson had a face-to-face view of Scott for approximately one minute. Williams pointed a gun at Jackson and told him to get onto the ground. Williams asked Jackson for his money and his wallet. As Jackson lay on the ground, he was only a few feet from Scott and could see his face. Eventually, Williams told Scott to get into Jackson's car and drive away. Williams then walked away. Jackson explained that a number of minutes passed from the time that Scott and Williams confronted him on the street until Scott finally drove off. During the encounter, Jackson had ample opportunity to observe

Scott and observed that he had "[s]light" facial hair, brown skin, was about 5'11", slim, and was wearing a black "hoodie" and dark jeans. N.T. 2/4/13, at 16-21, 38. Jackson's observations during the robbery were at least as reliable as other cases in which we have found the victim's observations reliable. *See*, *e.g.*, *McElrath v. Commonwealth*, 592 A.2d 740, 743 (Pa.Super.1991) (victim had sufficient opportunity to observe appellant so as to make reliable out-of-court identification even though she observed him for only five seconds); *Commonwealth v. Bell*, 562 A.2d 849, 851-52 (Pa.Super.1989) (victim had sufficient opportunity to observe appellant and make out-of-court identification even though he observed him only in silhouette for a few seconds).

Nor was anything at the scene of Scott's arrest improperly suggestive. After the robbery, Jackson telephoned the police, who arrived within a matter of minutes. Police officers immediately transported Jackson a couple of blocks away to where they had stopped Scott. Scott was *not* handcuffed but was sitting inside a police car. Jackson positively identified Scott as the person who had driven away in his car. Jackson clearly remembered Scott's face from the robbery and had no doubt "at all" about his identification, which took place just a few minutes after the robbery. N.T. 2/4/13, at 23-26, 36, 41, 47-48, 52-53. The police then drove Jackson to another individual (not Scott or Williams) that they had stopped. Jackson stated that this person was *not* involved in the robbery, demonstrating that he was not

simply identifying anyone whom the police presented to him. Finally, the police drove Jackson to a third location, where they had stopped Williams. There, Jackson positively identified Williams as the gunman. *Id.* at 27-28, 36, 57-58, 63. This evidence is at least as sturdy as other decisions in which we held that the identification of suspects in custody was admissible. *See Commonwealth v. Moye*, 836 A.2d 973, 976-78 (Pa.Super.2003) (identification was not unduly suggestive, even though it took place while defendant was handcuffed and was lone person inside police van, and even though prior to the identification, police told witnesses whose house had just been burglarized that they had person for witnesses to identify who had been found running down the street looking sweaty and tired); *Commonwealth v. Brown*, 611 A.2d 1318, 1320-21 (Pa.Super.1992) (victim's identification of defendant at hospital less than two hours after assault not impermissibly suggestive, even though victim saw weapon used in the crime prior to making identification and defendant was in handcuffs at time of identification); *McElrath*, 592 A.2d at 742-43 (victim's one-on-one identification of defendant who was in police custody not unduly suggestive, even though the victim noticed defendant's gun before focusing on his face at identification procedure, where victim had observed defendant for approximately five seconds during crime and made identification within thirty minutes of incident); *Bell*, 562 A.2d at 851-52 (victim's one-on-one out-of-court identification not impermissibly suggestive, even though

defendant was handcuffed in back of police van and victim had not gotten good look at his attacker); ***Commonwealth v. Walker***, 501 A.2d 1143, 1149-50 (Pa.Super.1985) (robbery victim's one-on-one identification of defendant fifteen minutes after crime and while defendant was in custody not unduly suggestive).

Scott claims that Jackson's identification at the scene of the arrest was suggestive because it took place after Jackson saw that the police had recovered his vehicle. Jackson, however, testified at the suppression hearing that minutes after the robbery occurred, he positively identified Scott as the person who drove away in his vehicle because he remembered Scott's face and had no doubt "at all" about the identification. In addition, police officers showed Jackson three different individuals, and he identified the first and third individuals as the culprits but said that the second individual was not involved. This demonstrates that Jackson did not identify Scott because of the alleged suggestiveness of the circumstances but because he truly recognized Scott as the perpetrator.

Therefore, the trial court properly denied Scott's motion to suppress Jackson's out-of-court identification.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/29/2015