J-S35030-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JORDON SCOTT BROWN | : | |
| | : | |
| Appellant | : | No. 242 MDA 2021 |

Appeal from the PCRA Order Entered January 22, 2021,
in the Court of Common Pleas of Huntingdon County,
Criminal Division at No(s): CP-31-CR-0000577-2015.

BEFORE:   OLSON, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KUNSELMAN, J.:          **FILED: MARCH 16, 2022**

Jordon Scott Brown appeals from the order denying his first petition filed pursuant to the Post Conviction Relief Act. 42 Pa.C.S.A. §§ 9541-9546. We affirm.

The PCRA court detailed the pertinent facts leading to Brown's convictions as follows:

> On the night of November 28, 2015, [Brown] engaged in a drug-fueled, paranoid, and quasi-suicidal episode in which, after a fight with his girlfriend, he set fire to her residence, fired two shots from his shotgun at Pennsylvania State Police troopers outside, exited the residence and got into an armed confrontation with those troopers, and only finally complied with their commands when his brother, standing behind the troopers and begging him to put the gun down, was somehow able to get through to [Brown] in his drug-induced daze. The shots were fired in the direction

_____

[*] Retired Senior Judge assigned to the Superior Court.

of a neighbor's home, which was occupied by a family with two children, and who were required to evacuate their home in the middle of the night, after being shot at, because of the risk of the fire started by [Brown] spreading to their home.

The responding officers that evening were troopers Michael Harris and Lance Howell. They were dispatched to the residence (a mobile home) pursuant to a 911 call from [Brown's] then girlfriend, Rachel Ann Labus, who reported that she was in the trailer and that [Brown] was suicidal and had a gun.

Both troopers were in uniform and were in a marked PSP patrol vehicle. Dispatch lost contact with Ms. Labus after the initial call, and as the troopers arrived on scene they did not know whether she was still in the trailer. Dispatch did relay that prior to losing contact with her she said she believed she had heard [Brown] fire a shot.

The troopers parked on the road, approximately three hundred feet from the trailer, and began their approach. Both were carrying long guns due to the nature of the call, and there was very little cover available in the area around the trailer. When they were approximately fifteen yards from the trailer Trooper Harris heard a shot and saw a muzzle flash from the rear east window. The shot struck near where Trooper Harris was standing.

After the first shot was fired the troopers began moving to a shed near the driveway, attempting to use it for cover. [Brown] fired a second shot at the troopers as they were seeking cover. The second shot struck a wood fence near where Trooper Howell was standing. The fence is on the property line, and on the other side of the fence, in the direction that [Brown] fired, is the residence of Kenneth Wise, Sr., Tonya Wise, and their two minor children, C.W. and K.W. (then approximately ages fifteen and ten years old, respectively). The Wise family was home, in their respective bedrooms, at the time the shot was fired. The distance between where [Brown] fired from and where Kenneth and Tonya Wise were sleeping is less than twenty-five yards.

Once at the shed the troopers repeatedly identified themselves and gave commands to [Brown], shouting

- 2 -

"State Police" and telling him to come out with his hands up. [Brown] responded with "Go away State Police!" and "State Police get the hell out of here!"

Approximately ten seconds after the above exchange, Trooper Harris saw smoke coming from the same window from which [Brown] had shot at him. The fire grew quickly, as soon Trooper Harris could hear crackling coming from the trailer, and the smoke coming out of the window became flames. This increased the stress and anxiety placed upon the troopers, because they did not know whether Ms. Labus or her children were in the trailer with [Brown], and the fire was growing rapidly. The troopers continued to identify themselves and command [Brown] to exit the trailer with his hands up.

Through the smoke, Trooper Harris saw that [Brown] had exited the trailer and was standing on the porch, facing the front door of the trailer, holding a shotgun in the "low ready" position. [Brown] appeared to be talking to someone or something, but due to the smoke Trooper Harris could not tell if anyone was on the porch with [Brown] or if he was forcing Ms. Labus and her children to stay in the trailer as it burned. Trooper Harris told [Brown] to drop the gun, and then moved from behind cover to close the distance between himself and [Brown], both to gain a better view and to be in a better shooting position if [Brown] forced the troopers to use lethal force. Both troopers repeatedly told [Brown] to drop his gun.

The standoff continued for a short time, with the troopers moving closer across open ground to try to determine whether [Brown] was holding anyone hostage in the burning trailer, while also placing themselves at great risk should [Brown] turn and shoot them.

Finally, Trooper Harris heard a voice behind him and Trooper Howell saying to [Brown] "What are you doing, it's the State Police." [Brown] finally responded to this voice, and dropped the shotgun. One of [Brown's] dogs ran out of the trailer and down the steps, toward the troopers and the voice behind them. [Brown's other dog was hiding in one of the bedrooms in the trailer, and was killed by the fire.] [Brown] then ran down the steps, laid on the ground after being commanded to by Trooper Harris, and was handcuffed

by Trooper Howell, as Trooper Harris kept [Brown] covered with his long gun.

The troopers asked [Brown] whether anyone was still in the trailer, but his speech was slurred and incomprehensible. The person who had shouted to [Brown] from behind the troopers came forward and was identified as [Dustin Brown, Brown's brother]. [Dustin] told the troopers that Ms. Labus and the children were safe and were at another location. The fire had spread so quickly that the trailer was now fully involved, so the troopers secured [Brown] in their patrol vehicle and requested fire department response.

[Dustin] told the troopers that he had come to the trailer after getting Facebook messages about what was happening with [Brown].

Trooper Howell was finally able to contact Ms. Labus, who was at a nearby residence. She confirmed that she was safe, and that her children were not in the trailer, but were safe with her grandmother. Trooper Howell remained with [Brown] while Trooper Harris went next door to the Wises' residence to get them to evacuate, due to the risk of the fire spreading to their residence. The Wises had taken cover in their basement upon hearing the shots fired by [Brown].

PCRA Court Opinion, 1/22/21, at 3-7 (formatting altered; citations and footnote omitted).[1]

The PCRA court further summarized the police interview with Brown:

Trooper Sean Hoffman interviewed [Brown] a few hours after the incident. At that time, [Brown] said that he had been using bath salts for two or three weeks, approximately one to one and one-half grams a day. His recollection of events was vague. He said that Ms. Labus had told him that "some guys" were coming to the trailer to "hit it." He

---

[1] The PCRA court summarized these facts based upon victim/witness statements, the criminal complaint, and the affidavit of probable cause, as well as testimony from the sentencing and the PCRA hearings.

remembered "pulling the trigger with the shotgun out the window," and "believed that he saw someone outside and shot." [Brown] said that he lit the fire "to attract attention and get some help." He also said that he was carrying his shotgun when he exited the trailer because he did not know who was coming for Ms. Labus and he thought she was "outside using more drugs."

PCRA Court Opinion, 1/22/21, at 7 (formatting altered; citation omitted).

On September 2, 2016, Brown entered negotiated guilty pleas to attempted manslaughter of a law enforcement officer, graded as a first-degree felony, arson, danger of death or bodily injury, graded as a first-degree felony, and recklessly endangering another person, graded as a second-degree misdemeanor. The plea agreement further capped the minimum aggregate sentence at 18½ years. In exchange, the Commonwealth agreed to dismiss the remaining 13 counts, which included four additional first-degree felonies. Prior to sentencing, Brown filed a motion to withdraw his guilty plea, which the trial court denied. Thereafter, the trial court sentenced Brown to an aggregate sentence of 18 to 36 years of imprisonment.

Brown timely appealed to this Court and challenged the discretionary aspects of his sentence. In a non-precedential decision filed on November 30, 2017, this Court affirmed Brown's judgment of sentence, and our Supreme Court denied his petition for allowance of appeal on October 11, 2018. *Commonwealth v. Brown*, 181 A.3d 459 (Pa. Super. 2017), *appeal denied*, 195 A.3d 566 (Pa. 2018).

Appointed counsel filed a PCRA petition on October 11, 2019, and subsequently retained PCRA counsel filed the amended petition at issue on

December 23, 2019. The PCRA court held an evidentiary hearing on February 21, 2020, at which plea counsel, appellate counsel, and Dustin Brown testified. On September 30, 2020, the court held another evidentiary hearing at which Brown testified. By order entered January 22, 2021, the PCRA court denied Brown's amended petition. Accompanying the court's order was an opinion with detailed factual findings regarding the incident, *see supra*, as well as detailed factual findings and credibility determinations regarding the testimony from the PCRA hearings. This appeal followed. Both Brown and the PCRA court have complied with Pa.R.A.P. 1925.

Brown raises the following seven issues, which we have reordered for ease of discussion:

1. Is [plea] counsel ineffective in advising [Brown] to enter a plea of guilty to an offense which is not viable as defined?

2. Must counsel make a reasonable investigation by speaking to available witnesses or arranging for a private investigator when he becomes aware, or should become aware, of evidence and witnesses which may contradict the Commonwealth's case?

3. Did the PCRA court err in denying the motion for a new trial on the charge of arson endangering others?

4. Did the PCRA court err in finding that counsel's ineffectiveness did not merit relief by holding that [Brown] was not prejudiced by any of his prior counsel's errors?

5. Are accurate sentencing guidelines relevant when a plea agreement calls for a "capped" minimum sentence?

6. May the reason for a sentencing being placed in or above the aggravated range of sentencing guidelines rely on the fact that the victim is a law enforcement officer, when

- 6 -

that offense may only be committed against a law enforcement officer?

7. Did the PCRA court err in *sua sponte* changing the offense of conviction by directing that the subsection which was charged from the initiation of the case be amended, and treating the same as a clerical error?

Brown's Brief at 4 (excess capitalization omitted).

Our scope and standard of review is well settled:

In PCRA appeals, our scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party. Because most PCRA appeals involve questions of fact and law, we employ a mixed standard of review. We defer to the PCRA court's factual findings and credibility determinations supported by the record. In contrast, we review the PCRA court's legal conclusions *de novo.*

***Commonwealth v. Reyes-Rodriguez***, 111 A.3d 775, 779 (Pa. Super. 2015)

(citations omitted).

Brown's first three issues allege the ineffectiveness of plea and appellate counsel.[2] To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish, by a preponderance of the evidence, that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. ***Commonwealth v. Johnson***, 966 A.2d 523, 532 (Pa. 2009). "Generally, counsel's performance is presumed to be constitutionally

_____

[2] Although, as phrased, Brown's third issue does not challenge plea counsel's ineffectiveness, it is clear from the supporting argument that this issue addresses another claim regarding plea counsel's advice to enter a guilty plea. ***See infra***.

adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." *Id.* This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) counsel's act or omission prejudiced the petitioner. *Id.* at 533.

Regarding claims of ineffectiveness in relation to the entry of plea, we further note:

> Ineffective assistance of counsel claims arising from the plea bargaining-process are eligible for PCRA review. Allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused the defendant to enter into an involuntary or unknowing plea. Where the defendant enters his plea on the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases.
>
> The standard for post-sentence withdraw of guilty pleas dovetails with the arguable merit/prejudice requirements for relief based on a claim of ineffective assistance of plea counsel, . . . under which the defendant must show that counsel's deficient stewardship resulted in a manifest injustice, for example, by facilitating the entry of an unknowing, involuntary, or unintelligent plea. This standard is equivalent to the "manifest injustice" standard applicable to all post-sentence motions to withdraw a guilty plea.

*Commonwealth v. Kelley*, 136 A.3d 1007, 1012-13 (Pa. Super. 2016) (citations omitted).

Moreover, "[o]ur law presumes that a defendant who enters a guilty plea was aware of what he was doing," and "[h]e bears the burden of proving

otherwise." ***Commonwealth v. Pollard***, 832 A.2d 517, 523 (Pa. Super. 2003) (citations omitted).

> The longstanding rule of Pennsylvania law is that a defendant may not challenge his guilty plea by asserting that he lied while under oath, even if he avers that counsel induced the lies. A person who elects to plead guilty is bound by the statements he makes in open court while under oath and may not later assert grounds for withdrawing the plea which contradict the statements he made at his plea colloquy.

***Id.*** On appeal, this Court evaluates the adequacy of the plea colloquy and the voluntariness of the resulting plea by looking at the totality of the circumstances. ***Commonwealth v. Yeomans***, 24 A.3d 1044, 1047 (Pa. Super. 2011).

In his first and second issues, Brown asserts that plea counsel was ineffective because he "did not investigate [Brown's] case, advised him to enter a plea of guilty to a charge that was not viable, and advised him that the deadly weapon enhancement would not apply." Brown's Brief at 11. In his third issue, Brown claims that plea counsel was ineffective for advising him to plead guilty to arson endangering others "as no individuals were endangered as a result of [Brown] burning up some clothing in a trash can." ***Id.*** at 19 (emphasis omitted). We address each claim separately.

In his first issue, Brown asserts that plea counsel was ineffective for advising him to enter a plea of guilty to attempted manslaughter of a law enforcement officer. Brown claims that this was a "non-viable charge," because it required him to possess "the specific intent to kill the Troopers negligently or accidently." ***Id.*** at 11. According to Brown, "[t]he criminal

- 9 -

attempt, which requires a specific intent, was not viable under the facts and circumstances of the case." ***Id.***

The PCRA court found no merit to this claim because the crime to which Brown pled guilty is a viable charge in Pennsylvania. The court first recognized the parameters of Brown's claim:

> [Brown's] argument is based on the interplay between 18 Pa.C.S. § 901, which establishes the *mens rea* necessary to find a defendant guilty of attempting to commit an offense, and the elements of the offense of Manslaughter of a Law Enforcement Officer in the First Degree set forth in 18 Pa.C.S. § 2507(c). However, his argument ultimately fails, as it ignores both controlling caselaw and basic tenets of statutory interpretation.

PCRA Court Opinion, 1/22/21, at 25-26.

The PCRA court then recognized that criminal attempt requires specific intent and that its application is limited to crimes which also require a specific intent:

> Under § 901(a), "[a] person commits an attempt when, **with intent to commit a specific crime**, he does any act which constitutes a substantial step toward the commission of that crime." (Emphasis added). This necessarily limits liability for criminal attempt to those offense requiring a *mens rea* of specific intent, because a person cannot intentionally commit an unintentional offense (such as one requiring a *mens rea* of recklessness or gross negligence). ***See Commonwealth v. Geathers***, 847 A.2d 730, 734 (Pa. Super. 2004) (attempted second and third degree murder are not viable offenses under Pennsylvania law, as such offenses only occur where the victim's death is the unintentional result of a criminal act; § 901 requires that the Commonwealth prove the defendant had the specific intent to kill the victim) ([citations omitted]).

- 10 -

*Id.* at 26.

The court noted the elements of the underlying offense, which is part of a criminal statute that provides varying degrees of crimes for the criminal homicide of a law enforcement officer, including murder and manslaughter. That statute reads, in pertinent part, as follows:

**§ 2507.  Criminal homicide of law enforcement officer**

\*\*\*

 **(c) Manslaughter of a law enforcement officer in the first degree.—**A person commits a felony in the first degree who does any of the following:

   (1) Without lawful justification kills a law enforcement officer while in the performance of duty and with knowledge that the victim was a law enforcement officer, if at the time of the killing:

        (i) the person is acting under a sudden and intense passion resulting from serious provocation by the victim killed; or

        (ii) the person is acting under a sudden and intense passion resulting from serious provocation by another individual whom the actor endeavors to kill, but the person negligently or accidentally causes the death of the victim.

\*\*\*

18 Pa.C.S.A. § 2507(c).

The PCRA court then provided the following analysis of Brown's claim:

   The criminal information charged [Brown] with, and he ultimately pleaded guilty to and was sentenced for, committing the offense under § 2507(c)(1)(ii).  [PCRA] counsel now looks to the "negligently or accidentally causes the death of the victim" portion of this subsection to argue that Manslaughter of a Law Enforcement Officer in the First Degree is not a specific intent offense, and that therefore

- 11 -

[Brown's] sentence for attempting to commit this offense is illegal. To say that such an interpretation of § 2507(c)(1)(ii) is incorrect does not even begin to encompass the magnitude of its erroneousness.

[Brown's] argument plucks one phrase from § 2507(c) and attempts to use it to negate the entirety of the remainder of the statute. This cannot be done. Words of a statute must be interpreted in context, they cannot be viewed in isolation.

Looking at the larger context, § 2507, titled "Criminal Homicide of Law Enforcement Officer," was enacted in 2008. Subsections (a) and (b) address murder of a law enforcement officer, and [subsections] (c) and (d) address manslaughter. With respect to manslaughter, it is clear that the General Assembly intended subsection (c) to address situations in which the offense otherwise would be Voluntary Manslaughter under 18 Pa.C.S. § 2503, and subsection (d) to address situations in which the offense would otherwise be Involuntary Manslaughter under 18 Pa.C.S. § 2504. Both of these statutes were in effect well before 2008, and the only differences between the elements of the offenses set forth in § 2507(c) and (d) and the elements of the offenses set forth in §§ 2503 and 2504 are that in each instance, the defendant killed "a law enforcement officer in the performance of duty" and knew at the time the victim was a law enforcement officer.

PCRA Court Opinion, 1/22/21, at 27-28 (citations and footnotes omitted).

Ultimately, the PCRA court explained why Brown's claim lacked merit:

With the understanding that Manslaughter of a Law Enforcement Officer in the First Degree is essentially Voluntary Manslaughter, but with a law enforcement officer as the victim, it is relatively easy to dispense of [Brown's] claim. It has been clear that Attempted Voluntary Manslaughter is a viable offense under the laws of the Commonwealth since at least 1983. *See Commonwealth v. Garner*, 461 A.2d 302, 303-304 (Pa. Super. 1983) (affirming the trial court's finding that Attempted Voluntary Manslaughter exists as an offense in the Commonwealth, since Voluntary Manslaughter "is an intentional killing, but

- 12 -

without the malice required to raise the degree of culpability to that of murder."; *see also Commonwealth v. Burns*, 765 A.2d 1144, 1151 (Pa. Super. 2000) (upholding the defendant's conviction and aggravated range sentence for Attempted Voluntary Manslaughter under 18 Pa.C.S. §§ 901(a), 2503(a)(1)).

What [Brown's] focus on the "negligently or accidentally" portion of § 2507(c)(1)(ii) ignores is that this subsection addresses transferred intent situations. The classic transferred intent example is that *A* intends to shoot *B*, but misses, and hits and kills *C* instead. The level of intent *A* possessed with respect to attempting to shoot *B* is transferred to the killing of *C*, so if *A* fired his shot intending to kill *B* under circumstances that would constitute voluntary manslaughter, he is guilty of voluntary manslaughter in regard to his killing of *C*. This is where the "negligently or accidentally" language comes into play, because *A* always intend to commit voluntary manslaughter, he simply killed the wrong individual. Had *A*'s intent in killing *C* had been anything other than negligence or accident, there would be no need for transferred intent, because by definition, he would have fired his shot intending to kill *C* in the first place. This is thus a very different situation than if the Commonwealth had charged [Brown] with Attempted Manslaughter of a Law Enforcement Officer in the Second Degree, which likely does not constitute a viable offense.

*Id.* at 29-30 (footnotes omitted).[3]

Our review of the record and pertinent case law supports the PCRA court's conclusion. *See*, **e.g.**, *Commonwealth v. Tolbert*, 670 A.2d 1172, 1179-80 (Pa. Super. 1995) (defining voluntary manslaughter as the

_____

[3] This crime mirrors the crime of involuntary manslaughter: "A person commits a felony of the second degree who, as a direct result of the doing of an unlawful or lawful act in a reckless or grossly negligent manner, causes the death of a law enforcement officer while in the performance of duty and the person knew or should have known the victim was a law enforcement officer. 18 Pa.C.S.A. § 2507(d).

intentional killing of another without malice but in sudden heat of passion brought on by legal provocation).

Brown's claims to the contrary are unavailing. He first maintains the same argument regarding the non-viability of the offense that the PCRA court debunks. *See* Brown's Brief at 17-18. Moreover, Brown's answers during the guilty plea colloquy refute his claims that he was not "instructed to the *mens rea* of the offense to which he entered a plea of guilty," and that "neither [plea] counsel nor the [trial] court adequately explained the definition of the offense" to him. Brown's Brief at 18.[4] *Pollard*, *supra*. Finally, because the offense to which he pled guilty is viable, his illegal sentence claim fails.

In his second issue, Brown challenges plea counsel's failure to investigate the incident fully by interviewing his brother, Dustin. To establish that trial counsel was ineffective for failing to investigate and/or call a witness at trial, a PCRA petitioner must demonstrate that:

> (1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant.

---

[4] Although Brown mentions plea counsel's alleged failure to advise him that the deadly weapon enhancement would be applied, he provides no further argument. We do note that the PCRA court did not find his PCRA hearing testimony regarding this issue to be credible. *See* PCRA Court Opinion, 1/22/21, at 25. Brown does reprise this claim as part of his sentencing argument. *See* Brown's Brief at 26.

*Commonwealth v. Hall*, 867 A.2d 619, 629 (Pa. Super. 2005) (citation omitted). Brown asserts that Dustin "was an available witness who had valuable testimony to provide," which would have corroborated his version of the incident. Brown's Brief at 11. Brown further contends that Dustin was an "available and reluctantly willing witness, but no one spoke to him about the case until the PCRA proceedings were pending." *Id.*

The PCRA court found that Brown's claim had arguable merit because plea counsel admitted that he knew Dustin was present on the night of the incident but did not hire an investigator or otherwise interview him. Nevertheless, the court found that plea counsel had a reasonable basis for not doing so:

> [Plea counsel] had a reasonable strategic basis for proceeding in the manner he did. His focus during the entirety of the matter was to negotiate a plea agreement that would, as he put it, give [Brown] a chance of paroling out of prison while he was still young enough to have a life, rather than serving a *de facto* life sentence. [Plea counsel] knew [the trial court] well, knew the District Attorney well, knew Huntingdon County juries well, and knew the primary victim and witness for the Commonwealth—Trooper Harris— well. This gave [plea counsel] a well-informed opinion of [Brown's] chances if the charges went to trial, and the sentences he would likely receive if convicted. He chose, after consultation with [Brown], to focus on obtaining the best plea deal possible. Had [plea counsel hired] an investigator and begun digging, he would have risked the momentum he had built toward such a deal. Further, knowing Trooper Harris (and other troopers involved in the matter) and his reputation for truthfulness and credibility on the witness stand, it would have been obtuse of him to believe that [Dustin] would have testimony or evidence that

- 15 -

would both contradict the totality of the evidence presented by the Commonwealth and be wholly believed by a jury. Even if [Dustin] had believable testimony that contradicted only the evidence regarding [Brown's] "Fuck you pigs!" and "Go away State Police!" statements, the evidence for the remaining charges was strong enough that [Brown] almost assuredly be convicted and receive a sentence longer than what was negotiated under the plea deal. As for the final prong [of the ineffectiveness test], had [plea counsel] interviewed [Dustin] and obtained testimony from him, it would not have altered the outcome for [Brown]. The best course would still have been to negotiate a plea deal, as opposed to going to trial, and the District Attorney would not have changed his position based on the contradictory testimony of a single, interested witness.

PCRA Court Opinion, 1/22/21, at 47-48.

Our review of the record supports the PCRA court's conclusions. Initially, we note that Dustin's availability was not established unequivocally. **See id.** at 21 (factual finding by the PCRA court that Dustin "did not contact anyone involved in the case . . . because he was under the impression that he 'had to be subpoenaed'"). Nevertheless, plea counsel's decision to pursue a plea deal was a reasonable strategy, given that counsel was able to obtain the withdrawal of thirteen additional charges, including four first-degree felonies. Brown's claim that even when pursuing a plea, counsel should have interviewed Dustin because "favorable defense evidence can assist in obtaining a favorable plea or in strengthening the defense negotiation position," amounts to no more than speculation. Brown's Brief at 32. Finally, considering the totality of the Commonwealth's evidence against Brown, we

- 16 -

concur with the PCRA court's determination that Brown could not establish prejudice.

In his third issue, Brown asserts that plea counsel was ineffective for advising him to enter a guilty plea to arson when the factual basis provided for this plea was insufficient. According to Brown, the factual basis for this charge was insufficient because it "did not establish that anyone was endangered as a result of the fire." Brown's Brief at 20.

With regard to the procedure followed regarding the entry of a guilty plea, this Court has stated:

> Pennsylvania has constructed its guilty plea procedures in a way designed to guarantee assurance that guilty pleas are voluntarily and understandingly tendered. The entry of a guilty plea is a protracted and comprehensive proceeding wherein the court is obliged to make a specific determination after extensive colloquy on the record that a plea is voluntarily and understandingly entered.

*Commonwealth v. Yeomans*, 24 A.3d 1044, 1046 (Pa. Super. 2011) (quoting *Commonwealth v. Fluharty*, 632 A.2d 312, 314 (Pa. Super. 1993)).

Rule 590(A)(1) of the Pennsylvania Rules of Criminal Procedure requires that a guilty plea be taken in open court. As noted in the Comment to Rule 590, at a minimum the trial court should ask questions to elicit the following information:

> (1) Does the defendant understand the nature of the charges to which he or she is pleading guilty or *nolo contendere*?

    (2)    Is there a factual basis for the plea?

    (3)    Does the defendant understand that he or she has the right to trial by jury?

    (4)    Does the defendant understand that he or she is presumed innocent until found guilty?

    (5)    Is the defendant aware of the permissible range of sentences and/or fines for the offenses charged?

    (6)    Is the defendant aware that the judge is not bound by the terms of any plea agreement tendered unless the judge accepts such agreement?

    (7)    Does the defendant understand that the Commonwealth has a right to have a jury decide the degree of guilt if the defendant pleads guilty to murder generally?

Pa.R.Crim.P. 590, Comment.

As noted above, this Court evaluates the adequacy of the plea colloquy and the voluntariness of the resulting plea by looking at the totality of the circumstances. *Yeomans*, 24 A.3d at 1047 (citation omitted). "Thus, even though there is an omission or defect in the guilty plea colloquy, a plea of guilty will not be deemed invalid if the circumstances surrounding the plea disclose that the defendant had a full understanding of the nature and consequences of his plea and that he knowingly and voluntarily decided to enter the plea." *Id.* Under Pennsylvania law, a reviewing court is free to consider a wide array of relevant evidence in addition to the transcript of the actual plea colloquy, under the totality-of-the-circumstances standard, to determine the validity of a claim and plea agreement, including, but not limited to transcripts from other proceedings, off-the-record communications

with counsel, and written plea agreements. ***Commonwealth v. Allen***, 732 A.2d 582, 589 (Pa. 1999).

The PCRA court found no merit to this claim:

> Simple review of the record and applicable statute reveals the absurdity of this argument.
>
> ***
>
> The initial victims of [Brown's] arson were Troopers Harris and Howell, who arrived on scene not knowing whether Ms. Labus or her children were in the trailer. They then had to endure an armed standoff with [Brown] that required them to balance their own safety, their desire to end the standoff without harming [Brown], and the need to make sure that anyone inside of the trailer was safe, all while the remaining time for which conditions in the trailer would remain survivable shrank toward zero (and all while standing just outside a burning structure). It was only due to the fortunate arrival of [Dustin] that the troopers were able to discern that no one else was in the trailer, thus avoiding the need to search it.
>
> The next victims of [Brown's] arson were the Wises. Having already taken shelter in their basement due to the gunfire, they were then forced to evacuate outside because of the danger of the fire at [Brown's] trailer spreading to their house, given the close proximity of the structures.
>
> Finally, while the general risk inherent for firefighters responding to fight fires is likely not sufficient for a conviction under [the arson statute], [Brown's] argument that no firefighters were endangered because none of them had to enter the trailer to extinguish the fire is both glib and self-serving. Given the speed at which the fire spread and the delay in the fire department's response caused by [Brown's] armed standoff with the troopers, the trailer was fully involved even before the fire department was called. Upon arrival the firefighters were forced to take a defensive posture, protecting neighboring exposures such as the Wises' house to prevent the fire from spreading.

- 19 -

PCRA Court Opinion, 1/22/21, at 37-38.

Our review of the record supports the PCRA court's conclusions. As noted above, the Commonwealth relied upon the affidavit of probable cause as providing the factual basis for the plea. In making his argument, Brown focuses on his admission provided in the affidavit that he "lit a fire in the residence using a butane lighter and set a pair of sweatpants on fire near the bedroom." **See** Brown's Brief at 20. He then argues that this factual basis did not establish that anyone was endangered because of the fire. **Id.**

Although the use of the affidavit of probable cause did not provide all the details regarding the entire incident, the factual basis provided was sufficient notice of the crime to which Brown was pleading. Brown's argument to the contrary ignores the totality of the circumstances surrounding his guilty plea. **Yeomans**, **supra**. Indeed, he acknowledges that the "fire spread" and the record establishes that the trailer was fully engulfed by the time the fire department arrived. In his brief, Brown cites **Commonwealth v. McCoy**, 199 A.3d 411 (Pa. Super. 2018), to argue that he was the only person in the "orbit of danger" because he "was the only person within the trailer who was at risk of bodily injury or death." Brown's Brief at 20-21. Brown's reliance upon **McCoy** is misplaced, as that case did not involve circumstances similar to this case or even the arson statute. Brown's third issue fails.

In his fourth issue, Brown asserts that the PCRA court erred in finding that his ineffective assistance claims did not merit relief by holding that he was not prejudiced by any of his prior counsel's errors. We have already

rejected Brown's claims involving plea counsel.[5]  Regarding appellate counsel, Brown's argument involves the effectiveness of counsel's challenge to the discretionary aspects of his sentence on direct appeal.  As phrased, Brown's fifth and sixth issues are direct challenges to the trial court's sentencing discretion, which are not cognizable under the PCRA.  **See generally**, **Commonwealth v. Fowler**, 930 A.2d 586 (Pa. Super. 2007).  Because his supporting argument on these two issues essentially assert that appellate counsel was ineffective for failing to raise these specific sentencing claims on appeal, we will consider these three issues together.

In arguing these issues, Brown failed to show actual prejudice as required by our precedent.  In **Commonwealth v.  Reaves**, 923 A.2d 1119 (Pa. 2007), our Supreme Court addressed whether a PCRA petitioner, whose counsel failed to file a motion to reconsider sentence suffered prejudice.  There, the Superior Court had summarily concluded that prejudice was presumed because counsel's inaction effectively waived Reaves' right to challenge this issue on appeal.

---

[5] As part of this issue, Brown raises additional alleged shortcomings regarding plea counsel's representations to him during the plea colloquy.  **See** Brown's Brief at 34-35.  After review, we conclude these claims are either refuted by Brown's answers during the plea colloquy, **Pollard**, **supra**, or inconsequential when considering the totality of the circumstances surrounding Brown's plea. **Yeomans**, **supra**.  This is especially true, considering the PCRA court's conclusion that plea and appellate counsel provided credible testimony, but Brown's PCRA hearing testimony was unworthy of belief.  **See** PCRA Court Opinion, 1/22/21, at 23-25.

Our Supreme Court disagreed. Instead, the High Court held that a PCRA petitioner raising a claim of ineffectiveness regarding counsel's failure to file a motion for reconsideration must establish *actual* prejudice. *See Reaves*, 923 A.2d at 1130. Specifically, the Court held that a PCRA petitioner must show that, if counsel had taken a certain action, it would have led to a more favorable sentence:

> The Commonwealth argues that the Superior Court's prejudice analysis misses the mark because the panel improperly focused on the effect of counsel's inaction upon the [**appeal**], rather than looking to the outcome of the underlying [proceeding] itself. The Commonwealth is correct. Although contemporaneous objections operate to preserve issues for appellate review, they serve an equally important function in **obviating** appeals by affording the trial court a timely opportunity to correct mistakes and/or to reconsider decisions. Whether [counsel] can be deemed ineffective, then, depends upon whether [a defendant] has proven that a motion to reconsider sentence if filed . . . would have led to a different and more favorable outcome at [sentencing]. In this context, the only way the proceeding would have been more favorable would be if counsel's objection secured a reduction in the sentence. The Superior Court panel erred as a matter of law in failing to appreciate the actual focus of the [actual] prejudice standard.

*Reaves*, 923 A.2d at 1131-32 (emphasis in original; footnote omitted). Our Supreme Court further concluded that the PCRA petitioner did not establish actual prejudice, since "[on] this record, there is no reason to believe that, if only counsel had asked for a statement of reasons for the sentence at the

[time of sentencing] that statement or explanation alone would have led the court to reduce the sentence"). *Id.* at 1132.[6]

Here, the PCRA court, who was also the sentencing court, considered the alternative discretionary issues appellate counsel failed to raise on appeal, *i.e.*, Brown's fifth and sixth issues, and determined that none of them would have led it impose a reduced sentence. *See* PCRA Court Opinion, 1/22/21, at 38-43. The court further opined that "because of the severity of the aggravating factors present and the need for the protection of the public, [the trial court] determined that a sentence consistent with the cap agreed to between [Brown] and the Commonwealth was appropriate." *Id.* at 41. Thus, Brown cannot establish actual prejudice and his fourth, fifth and sixth issues provide no basis for relief.

In his final issue, Brown asserts that the PCRA court erred in treating the fact that he pled guilty to the wrong subsection of Section 2507 as a clerical error and correcting the information *sua sponte*.

In rejecting this claim, the PCRA court found that the subsection of manslaughter of a law enforcement officer, § 2507(c)(1)(ii), that was listed in the information and to which Brown pled guilty, involved the doctrine of

---

[6] Although **Reaves** involved his counsel's failure to file a motion for reconsideration and Brown claims his counsel failed to raise certain arguments in his discretionary challenge, both circumstances involve counsel's failure to preserve a sentencing claim. Therefore, under **Reaves**, Brown must establish actual prejudice.

transferred intent. The PCRA court later determined that this subsection of the statute:

> [did] not match with the facts alleged by the Commonwealth and accepted as true by the [trial court] as part of [Brown's] guilty plea (nor with the testimony at the PCRA hearings). Per those facts, [Brown] fired his two shots directly at Troopers Harris and Howell, intending to kill them. This brings the facts of this instant case firmly within the ambit of § 2507(c)(1)(i), which addresses situations in which an actor, under provocation sufficient to reduce the offense to voluntary manslaughter, kills a law enforcement officer in the performance of duty knowing that the victim is a law enforcement officer.

PCRA Court Opinion, 1/22/21, at 31-32.

The PCRA court then noted that, had this issue been caught earlier, the Commonwealth could have moved to amend the information pursuant to Pa.R.Crim.P. 564, and, even had the case gone to trial and the finder of fact found Brown guilty of subsection 2507(c)(1)(i), the fact that the criminal information charged a different subsection of the crime would not have rendered the conviction invalid. *See id*. (citing *Commonwealth v. Jones*, 912 A.2d 268 (Pa. 2006); *see also Commonwealth v. Mentzer*, 18 A.3d 1200, 1205 (holding a criminal information may be amended after verdict but before sentencing when the specified crime in the original information involves the same basic elements and evolved out of the same factual situation as the crime specified in the amended information).

Here, the PCRA court recognized that "[t]he difficulty in the instant case is that the incorrect statutory citation [was] carried through the entirety of the

- 24 -

matter." PCRA Court Opinion, 1/22/21, at 34. The PCRA court cited decisions from our sister states to determine the way courts have corrected errors in the record discovered after conviction and sentencing. **See** PCRA Court Opinion, 1/22/21, at 35-36, and found a Kansas statute harmonious with Pennsylvania case law that permits the courts of this Commonwealth to exercise their "inherent power to correct errors in [their] records or orders so they speak 'the truth' and thereby reflect what actually took place in [the] judicial proceedings." **Id.** at 36 (citing **Commonwealth v. Borrin**, 80 A.3d 1219, 1227 (Pa. 2013). The court thus concluded that the "correct approach" was "to treat the citation to § 2507(c)(1)(ii) as a clerical error. The record [should] thus be corrected to reflect that [Brown] was convicted, via guilty plea, of violating § 2507(c)(1)(i)." PCRA Court Opinion, 1/22/21, at 37.

According to Brown:

> The court erred in *sua sponte* changing the subsection of the conviction. The *mens rea* of the charge involves specific intent to kill a police officer and also requires serious provocation either by the victim or another whom the defendant intends to kill. In reviewing the charge and the conviction, the [PCRA court] found that the charge for which [Brown] was charged and entered a guilty plea should be changed to another section without notice or colloquy. This cannot be seen as a merely clerical correction. Changing the alleged offense to indicate that an intent to kill was a result of serious provocation by law enforcement changes the factual basis for the plea in a significant manner, particularly where [Brown] denied awareness of the presence of the police.

Brown's Brief at 12. Without citation to authority or even discussion, Brown asserts that the variance between the facts and the crime charged renders his

sentence illegal. Brown's Brief at 14. We can address an illegal sentencing claim *sua sponte*. **Commonwealth v. Watley**, 81 A.3d 108, 118 (Pa. Super. 2013). As noted below, Brown's sentence was not illegal.

In his brief, Brown also does not develop his bare assertion that he had no notice of the correct subsection—that the Commonwealth identified the victim as Trooper Harris; rather, he now claims there was insufficient provocation by the trooper to sustain the Section 2507(c)(1)(i) charge. **See** Brown's Brief at 16-17.[7] Because this claim is being raised for the first time on appeal, however, it is waived. **See generally**, Pa.R.A.P. 302.[8]

Regarding Brown's claim that the PCRA court cannot fix a clerical error, we turn to our precedent on this issue. In **Commonwealth v. Young**, 695 A.2d 414 (Pa. Super. 1997), the defendant was charged with two counts of indecent assault: Section Pa.C.S.A. 3126(a)(1) (lack of consent- Count 2) and Section 3126(a)(4) (substantially impaired victim-Count 3). "The facts elicited throughout the proceedings below were consistent with a prosecution for indecent assault as defined by Count 2 of the indictment, and [the defendant] knowingly and voluntarily admitted to acts which violated Count 2 of the indictment." **Young**, 695 A.2d at 419. However, "the [trial] court, the prosecution and defense counsel committed, in essence, a clerical error by

---

[7] Brown further misidentifies the crime to which he pled guilty as **involuntary** manslaughter of a law enforcement officer. **See** 18 Pa. C.S.A. § 2507(d).

[8] We further note that "serious provocation" is required for both subsections of 2507(c).

permitting [the defendant] to plead guilty to the wrong sub-section of the indecent assault statute." *Id.* The defendant ultimately filed a PCRA petition resulting in the PCRA court's allowing him to withdraw his guilty plea.

The Commonwealth appealed, and this Court reversed the award of post-conviction relief. We explained as follows:

> We do not believe that such an error is tantamount to manifest injustice. [The defendant] was charged in Count 2 with violating [Section] 3126(a)(1), and he voluntarily admitted to facts which constituted that charge. The fact that judgment of sentence indicates that [the defendant] pleaded guilty and was sentenced on Count 3, [Section] 3126(a)(4), does not affect the voluntariness of [the defendant's] plea where there was no confusion as to his commission of Count 2. [The defendant] intended to plead guilty to indecent assault as defined by [Section] 3126(a)(1), and we will not permit him to withdraw his plea simply because the trial court, his counsel and the prosecution failed to insure that [the defendant] pleaded guilty to the correct count of the indictment.
>
> Presently, the PCRA court should have corrected the clerical error of counsel and the trial court which permitted the judgment of sentence to indicate that [the defendant] had been sentenced on indecent assault as defined by Count 3, rather than by Count 2. The power to modify a judgment of sentence to amend records, to correct mistakes of court officers or counsel's inadvertencies is inherent in our court system, even after the thirty-day time limit set forth in 42 Pa.C.S.A. § 5505, has expired. Thus, we will herein correct the clerical error which appears on the face of the judgment of sentence by setting forth the correct sub-section of the indecent assault statute, *i.e.*, substituting Count 2 of the indictment for Count 3.

*Young*, 695 A.2d at 419-20 (footnotes and citations omitted).

Here, s in *Young*, we conclude that the erroneous reference to Section 2507(c)(ii) as opposed to Section 2507(c)(i) does not invalidate Brown's guilty plea. Brown pled guilty to attempted voluntary manslaughter of Trooper Harris. Moreover, the factual basis for the plea, which Brown acknowledged, encompassed the correct subsection. As the PCRA court noted:

> What is clear, however, is that everyone involved in the case, from the troopers and the District Attorney's Office to [plea counsel], [the trial court], and [Brown] himself, understood the allegation to be that [Brown] had directly fired at Troopers Harris and Howell, and that the basis of the charge was that in doing so, [Brown] had intended to kill Trooper Harris.

*Id.* at 32 (footnote omitted). We find ample support for this conclusion in our review of the certified record. *See Jones*, 912 A.2d 268, 289 (Pa. 2006) (holding that, when properly read in a common sense manner, first-degree murder indictment gave defendant adequate notice of the charges against him, although the criminal information did not specify the specific intent elements as to the unintended victim of shooting). Thus, we concur with the PCRA court's directive to correct the record. *See supra*.

In sum, Brown has failed to meet his burden regarding his ineffectiveness claims of both plea and appellate counsel. In addition, the PCRA court did not err in directing amendment of the record. Brown is not entitled to any post-conviction relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/16/2022